TAYLOR MANUF'G CO. *v.* HATCHER MANUF'G CO.

HATCHER MANUF'G CO. *v.* TAYLOR MANUF'G CO.

*(Circuit Court, S. D. Georgia, W. D.* March 28, 1889.)

1. DAMAGES—MEASURE OF, FOR BREACH OF CONTRACT—EXPENSES AND PROFITS.
   When there have been part performance, and expenditures properly made by one of the parties to a contract, which is broken by the fault of the other party, the party performing may recover his reasonable expenditures. He may also recover the profits of the contract, if he proves that direct, as distinguished from speculative, profits would have been realized. If the expenditures of the party not at fault are unreasonable, it is the duty of the opposite party to show it.

2. SAME—DIRECT AND SPECULATIVE PROFITS.
   Profits remote and speculative, and incapable of clear and direct proof, cannot be recovered; but when they are the direct and immediate fruits of the contract, they may be. They are then part and parcel of the contract itself, entering into and constituting a portion of its very elements. Citing leading American case, *Masterton* v. *Mayor,* 7 Hill, 69.

3. SAME.
   The leading English case announces the rule thus: "Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered, either arising naturally, *i. e.,* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it." *Hadley* v. *Baxendale,* 9 Exch. 341–353.

4. SAME—CONTINGENT DAMAGES.
   Damages which are the legal and natural result of the act done, though to some extent contingent, are not too remote to be recovered. Code Ga. § 3073.

5. SAME.
   Where, by the action of the party at fault, the profits of a contract have been prevented, all recovery therefor will not be defeated because exact and absolute proof is unattainable; and, in view of the tortious refusal of the party at fault to perform its contract, the party injured is permitted to show the particular facts which have transpired, and the entire transaction upon which the claim and expectation of profits is founded, in order to prove with reasonable certainty what the profits would have been.

**6.** SAME—LOSS OF COMMISSIONS BY AGENT.

Where a company manufacturing agricultural steam-engines agrees to furnish an agent, who sells on commission, the engines necessary to supply the season's demand, and the agent makes large expenditures in advertising, canvassing, and otherwise building up the trade, and proves a heavy demand upon him for these particular engines largely in excess of his order to the company, the company refusing without sufficient cause to furnish the engines ordered, will be held liable for the sum of commissions on the engines ordered, and for the reasonable expenditures of the agent in their undertaking.

**7.** SAME—REMOTE DAMAGES—INJURY TO BUSINESS.

A claim for damages, upon the facts stated in the preceding section of syllabus, for destruction generally of agent's business, is too indefinite and uncertain to be the basis of a recovery.

**8.** CONTRACT—EXCUSE FOR NON-PERFORMANCE.

A clause in the contract, obliging the manufacturing company to furnish engines if the exigencies of their business permitted, gave them, under the facts, no arbitrary right to refuse. They must have a valid reason for the refusal, or its validity must be shown by evidence.

(*Syllabus by the Court.*)

In Equity. Bills for account.

*Lanier & Anderson* and *Alex. Proudfit*, for the Taylor Manufacturing Company.

*Bacon & Rutherford, Hill & Harris*, and *Eugene Hawkins*, for the Hatcher Manufacturing Company.

SPEER, J. These causes have been, after much circuity of pleading, tried upon the original bill of the Taylor Manufacturing Company, as plaintiff, and that of the Hatcher Manufacturing Company, used as a cross-bill, as defendant. After repeated preliminary hearings, the issues of law and fact were referred to the master in chancery. His report has been filed, and both parties have excepted thereto. For convenience of reference the parties are termed by the master the "Taylor Company" and the "Hatcher Company," and these designations will be here adopted.

The Taylor Company, of Chambersburgh, Pa., are manufacturers of steam-engines, suitable for agricultural uses. They made a written contract with M. J. Hatcher & Co., constituting the latter their agents for the purpose of selling the engines in a large number of the counties in this state. This contract was practically identical with a previous contract between the same parties for the year 1884. It made Hatcher & Co. the sole agents of the Taylor Company in the specified territory, and was of force from January 1, 1885, to January 1, 1886. In brief, the Taylor Company agreed to furnish the engines, and blank forms of contracts of sale, essential to the business, and the Hatcher Company agreed to carry on the business as directed by the terms of the contract. These are specially found by the master, and his finding, both as to the terms of the written contracts and the issues thereon made by the pleadings, are accurately stated, and are generally approved.

Upon the disputed issues of fact the master finds that the Hatcher Company disregarded the contract of February 3, 1884, in that they sold engines for credit, and did not exact cash for one-third of the price, and

notes at short terms for the balance; but that the breach of the contract was clearly ratified by the Taylor Company. He finds that the contract of December 8th was broken in like manner, and that there was neither authority for the breach nor subsequent ratification. He finds that the contract of 1884 was not modified by subsequent parol agreement. He finds that the Taylor Company violated the contract of December 9, 1884, in that they failed to deliver in Macon, on or about July 15th, 16 engines sold outright to the Hatcher Company, and to deliver under the terms of the agency contract 16 other engines at the same time. The master finds that these breaches are without justification. . He does not attribute this failure to intentional fraud on their part, but to a desire of the Taylor Company to terminate the agency because of anticipated loss and litigation. He finds no fraud or error in a settlement of the 1st of August, 1885, but he also finds that it did not comprehend the questions of liability growing out of the Taylor Manufacturing Company's failure to deliver engines as they were bound by the contract of December 9, 1884. He finds that after August 1, 1885, the Hatcher Company had written authority to sell without exacting one-third cash, and that the Taylor Company was justified by their contract in refusing to fill the orders made by the Hatcher Company in June, 1885. He finds that the Hatcher Company was bound to guaranty to their principal all debts accepted by them in their agency. The master reports a balance against the Hatcher Company of $8,902.29, subject to recoupments of commissions on the unpaid notes of 1884 and 1885 as such notes are paid, and he suggests that a receiver be appointed to take charge of the assets of the agency business, to sell the same, collect the notes, in order that the rights of the parties may be finally settled. There are other findings not essential to the main matters of the controversy.

To the report of the master numerous and voluminous exceptions have been filed, and the issues thus presented have been elaborately argued, orally and by brief. The court has had little difficulty in the ascertainment that the conclusions of the master, as we have said, are generally accurate, and are sustained by the law. With reference, however, to the sixth finding, which disallows the claim of the Hatcher Company for damages resulting from the failure of the Taylor Company to ship 32 engines, as ordered by the Hatcher Company, for the trade of 1885, we have had more trouble. The master was of the opinion that this claim of the Hatcher Company is without legal merit, for the reason, as stated by him on page 86 of the report, that it belongs to the category of "gains, contingent upon the productiveness of the season, the fluctuations of trade, the resources and efforts of competitive dealers," and are too uncertain to be capable of that clear and direct proof which the law requires. There may be found cases which tend to sustain this finding, but they seem adverse to the philosophy of the law. It is apparent that, the master having found, as before stated, that the failure to furnish the 32 engines above referred to was an unmistakable and unjustifiable breach of the contract, and that it has not been adjusted or settled, the Hatcher Company are only called upon to show the degree of proof es-

sential to an estimation of the damages directly resulting therefrom. To do this the Hatcher Company point out the fact that the selling price of the engines is fixed by the contract. The commissions of the Hatcher Company being perfectly definite, if it be clear that there was a sufficiently certain opportunity to sell the engines, it follows that to ascertain the amount of which the Hatcher Company have been bereft is a simple matter of computation. Now, could the Hatcher Company have readily sold these engines had they been furnished in time and in accordance with the ascertained obligation of the Taylor Company? The evidence relied on to show this is properly made a part of the exception. It is there made to appear that the Taylor Company, by its president, estimated that the Hatcher Company would sell 75 engines that season. A witness, Herron, testified that in his judgment 65 or 75 engines would have been sold by the Hatcher Company. He was familiar with the business, and his estimate was based upon the number of inquiries, the prospect of a good crop, the demand for engines by customers in person and by correspondence. Barron, another witness, gives a still larger estimate. It is made plain that the year before the sales were large, and in 1885 Hatcher & Co. had advertised the Taylor engines thoroughly; had, indeed, devoted all of their energies exclusively to the business of the Taylor Company; did not try to sell any other engines; and that there were frequent inquiries, and, in fact, a great demand, for the engines. Besides, the crop prospect in the spring and summer was fine. The witness stated in addition that there were a hundred men who wanted to buy the Taylor engines from Hatcher in 1885. The witness was employed by Hatcher. The orders were not given, because he could not promise to supply the applicants, on account of the action or non-action of the Taylor Company. Hatcher, one of the defendants, testifies substantially to the same facts, and added that the business was now established; that the Taylor's was "a good engine," and had given satisfaction; that his territory had been increased, and the engines were sold at "closer figures." There were 50 or 60 applications on the "application book," and many applications were not entered. This book was kept to show the number of persons who called to make inquiry relative to engines. It was put in evidence, and showed about 50 such applications. The demand was so definite that Hatcher at length proposed to purchase outright certain engines for the agency business; and the correspondence in evidence shows this. McDowell, the treasurer of the Taylor Company, who had gone to Macon to look after the business, writes, on August 3d, to his company: "The engines you send, ship as soon as possible, as parties coming in to buy expect to take engines with them, or have them delivered at once." Smith, a merchant who dealt in engines, a witness at once intelligent and disinterested, testified that the trade in engines was large during the selling season of 1885. This he knew from his own business. In addition to this evidence there are in the record admissions of the Taylor Company's agent, J. C. Weaver, which have valuable importance. In the letter of August 31, 1885, to the Taylor Company, he writes:

"He [Hatcher] virtually lost the entire season trade, which is now over. * * * His trade, on account of the engines not ariving, countermanded their orders, and got engines elsewhere. * * * It got winded about that Hatcher could get no engines."

The same agent, July 1, 1885, notified his principal, the Hatcher Company, that several parties had countermanded their orders on account of the Taylor Company's letters to them. So strong was the demand that, when the Taylor Company refused to fill nine orders made to Hatcher as agent, the latter offered to buy the engines outright. This is admitted by Weaver, in his letter of July 3, 1885. The Taylor Company offered no matter of fact to avoid the effect of this evidence, which itself has not been negatived by the master's finding, viz.: that there was in the refusal to ship these engines an unjustifiable breach of their contract with the Hatcher Company. They insist generally that Hatcher was a faithless agent, but there is in the record nothing sufficient to show it.

It is insisted, however, that the commissions, which can be computed upon the number of engines ordered and refused, are too remote and speculative to warrant a judgment therefor. To support this proposition the counsel for the Taylor Company rely on the case of *Manufacturing Co.* v. *Rogers*, 19 Ga. 416, where Rogers complained that because of the company's failure to repair the machinery of his mill, which was idle from 60 to 90 days, he was entitled to a recovery for the profits the mill would have made if it had been kept running, but the court held that such claim was founded almost exclusively on speculative profits; it was a calculation upon conjectures, and not upon facts. Substantially the same announcement is made in *Water Lot Co.* v. *Leonard*, 30 Ga. 560, and in *Vischer* v. *Railroad Co.*, 34 Ga. 536; and an analogy is sought to be drawn also from *Clark* v. *Neufville*, 46 Ga. 261. The master, in his careful and painstaking report, as we have seen, sustains this contention.

The consideration of the intricate topic embraced in these diverse propositions has deferred the determination of this cause, and has not been without difficulty. The most authoritative statement of the rule upon the question will be found in the *U. S.* v. *Behan*, 110 U. S. 338, 4 Sup. Ct. Rep. 81. The facts of that case (without elaborately stating them) are sufficiently analogous to the findings of fact of the master here to make the principles settled clearly applicable. There was part performance of the contract, large expenses on the part of the party performing. Without fault of this party the performance of the contract was prevented by the fault of the other party. The question was presented to the court of claims, and that court held that "the profits and losses must be determined according to the circumstances of the case, and the subject-matter of the contract. * * * The reasonable expenditures already incurred, the unavoidable losses incident to stoppage, the progress attained, the unfinished part and the probable loss of its completion, the whole contract price, and the estimated pecuniary result, favorable or unfavorable, to him, had he been permitted or required to go

on and complete his contract, may be taken into consideration." The court then allowed the "unavoidable losses and expenditures already incurred," but said: "We can give nothing on account of prospective profits, because none have been proved." The supreme court decides as follows, Mr. Justice BRADLEY delivering the opinion:

"We think that these views, as applied to the case in hand, are substantially correct. * * * Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred in the fair endeavor to perform the contract which he assumed. If they were foolishly or unreasonably incurred, the government should have proven this fact. It will not be presumed. The court finds that his expenditures were reasonable. The claimant might also have recovered the profits of the contract if he had proven that any direct, as distinguished from speculative, profits would have been realized. But this he failed to do, and the court below very properly restricted its award of damages to his actual expenditures and losses."

Pausing at this point in the consideration of the law to apply the principle, with reference to expenditures incurred in part performance of the contract thus settled, to the findings of the master, it will be apparent that it has been recognized by him as applicable here. On line 19 *et seq.* of his third conclusion of law, the master declares "it is certain that the Hatcher Company is entitled to recover the amount expended on faith of said contract of December 9, 1884, which contract the Taylor Company failed to perform." He suggests that to ascertain that amount a trial by jury might be had. In this finding the master is only partially right. After stating the principle, which he did correctly, he should have accepted the undisputed evidence showing that these expenditures aggregated $6,127.15, and this amount should have been credited to the Hatcher Company. Of these an account is annexed as an exhibit, and its correctness is fully supported by the testimony of Hatcher, and there is no evidence to dispute it. It was criticised in argument, but there is nothing on the face of the account to impeach its verity. To use the language of the supreme court in *U. S.* v. *Behan,* above quoted, if these expenditures "were foolishly or unreasonably incurred" the Taylor Company should have "proven this fact; it will not be presumed." And this is the final hearing, and the parties are presumed to have offered all the evidence at their command.

A more important question is: Have the Hatcher Company proven sufficiently the direct profits of their contract, as distinguished from profits of a speculative character? It is true, as held by the master, that profits too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires, cannot be recovered. But, to quote the language of Chief Justice NELSON, in *Masterton* v. *Mayor,* 7 Hill, 69, cited with approval in *U. S.* v. *Behan, supra,* "where they are the direct and immediate fruits of the contract," they are free from this objection; they are then "part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is

just as clear and plain as to the fulfillment of any other stipulation." This case is cited, and its principle adopted by the supreme court of Georgia, in *Water Lot Co.* v. *Leonard*, 30 Ga. 560, relied upon by the Taylor Company. It is true, however, before the damages can be recovered they must be proved, and the serious question is, have they been sufficiently proven? This inquiry involves the question what proof is sufficiently direct and explicit to authorize a recovery of the profits of a contract partially performed and broken, without fault of the party performing. In his copious and valuable work upon the law of damages Mr. Sutherland announces this general proposition:

"A party to a contract is entitled to recover, against the other party, who violated it, damages for the profits he would have made out of it had it been performed. It is no objection to their recovery that they cannot be directly and absolutely proved. In the nature of things, the defendant having prevented such profits, direct and absolute proof is impossible. The injured party must, however, introduce evidence legally tending to establish damage, and legally sufficient to warrant a jury in coming to the conclusion that the damages they find have been sustained, but no greater degree of certainty in this proof is required than of any other fact which is essential to be established in a civil action. If there is no more certain method of arriving at the amount, the injured party is entitled to submit to the jury the particular facts which have transpired, and to show the whole transaction, which is the foundation of the claim, and expectation of profit, so far as any detail offered has a legal tendency to support such claim." 1 Suth. Dam. 113; citing *Griffin* v. *Colver*, 16 N. Y. 489; *Giles* v. *O'Toole*, 4 Barb. 261; *Newbrough* v. *Walker*, 8 Grat. 16.

Now, what is the legal nature of the fact involved in the finding of the master that the Taylor Company refused to deliver the engines under the contract? It is simply a tortious refusal on the part of the Taylor Company to perform an undertaking absolutely essential to the business of the Hatcher Company. The master, as we have seen, finds the breach. He finds it without excuse, and in cases of this character it is only necessary to show with reasonable certainty what the profits would probably have been. 1 Suth. Dam. 121, and many authorities cited. The philosophy of this rule is readily intelligible. One will not be permitted, because the injurious consequences of his wrongs are not precisely definite in pecuniary amount, to wholly absolve himself from responsibility therefor, and this would be the result were the rule otherwise. The Hatcher Company had, by diligent industry, created a large and important business, to which they had devoted their time for several years. The delivery of the engines to them was the first and most absolute essential. The Taylor Company undertake to do this. The Hatcher Company rely upon their promise. The Taylor Company utterly refuse to comply. It is impossible that it be the law, because, perchance, the Hatcher Company might have failed to sell an engine, more or less, or that because, perhaps, they may fail in specified instances to collect promptly the purchase price, that the Taylor Company will be adjudged irresponsible for their inexcusable breach of contract. But this is not all. The profits of the Hatcher Company were fixed by the

contract. The engines had a market price; and, as was said by Chief Justice NELSON in *Masterton* v. *Mayor, supra:* "If there was a market value of the article in this case the question would be a simple one." The demand was great, and it was not to be doubted, from all the evidence heretofore detailed, that the sale of all the engines was a substantial certainty. The amount of the profits of the Hatcher Company is at the least, then, the sum of their commissions on such sales. It would have been, doubtless, more, because a portion of the engines were purchased outright; but, considering the tortious character of the action of the Taylor Company, we are at the least warranted in adjudging to the Hatcher Company the amount of the sum of their commissions on the engines ordered by them, and which the Taylor Company wrongfully refuse to deliver. This is estimated at $10,056.06, but the court will direct a careful computation. Indeed, if this be a Georgia contract, as is insisted by the Taylor Company, upon the authority of the latest decisive adjudication in *Stewart* v. *Lanier House Co.*, 75 Ga. 582, the rule is stronger against the Taylor Company than that announced here. There, where the lessors of an hotel failed to keep it in repair as they had covenanted, it was held that the lessee could recoup against suits for the rent, the loss of custom, and the profits he might have made if the hotel had been kept in a proper condition, and that he was only required to show facts which would enable the jury to approximate his losses. See, also, Code Ga. § 3073, which provides that "damages which are the legal and natural result of the act done, though contingent to some extent, are not too remote to be recovered." It will be advisable to consider in this connection the leading English case of *Hadley* v. *Baxendale*, 9 Exch. 341. There ALDERSON, B., for the court, adjudges the rule to be as follows:

"Where two parties have made a contract, which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i. e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it." Page 353.

The damages claimed by the Hatcher Company here would seem to be embraced in both the classifications indicated in the rule just quoted. The finding of the master disallowing the claim of the Hatcher Company for the destruction of their business is affirmed, the claim being esteemed too indefinite and uncertain to be the basis of a recovery. It was at the option of the Taylor Company to terminate the sale of their engines by the Hatcher Company the next year if they had seen fit to do so. What the Hatcher Company might have accomplished with the sale of other machinery is in the realm of conjecture.

The view of the Taylor Company, that the clause in their contract which obliged them to furnish the engines Hatcher might require if the exigencies of the business permitted, is important, is altogether erroneous. This clause must have a practical and equitable construction. It

did not give them the power arbitrarily to decide that the exigencies of the business would not permit the engines to be furnished. They must have a valid reason for such a conclusion, and its validity must be shown by evidence. The courts of equity would never, in the absence of express declarations, construe such a clause to mean that, notwithstanding the services and expenditures of the Hatcher Company, the Taylor Company could at pleasure refuse to do anything towards the performance of the obligations they had undertaken. Nor does it follow that, because the Hatcher Company is bound by their contract to indorse all the notes, they are to be deprived of their commissions. It is judicially known to the court that the Taylor Company have taken possession of the notes, have discounted them with the banks, and that the Hatcher Company have no control of them whatever. It is not satisfactorily made to appear by the evidence what amount of these notes were insolvent, nor whether it would have been impossible to ultimately collect them, had not the business been disorganized, and the Hatcher Company harassed and discredited with the business community by the unjustifiable action of the Taylor Company before adverted to.

On the hearing of the injunction, the court, being advised of the fact that the Taylor Company had transferred and assigned all notes on which commissions are claimed to certain banks, required the Taylor Company to give a conditional bond of $10,000 for the protection of the Hatcher Company. The banks are not parties to the suit. The court has no means of knowing the *status* of collections upon these notes, nor can the court by its receiver take possession of the notes which are out of its jurisdiction. The Taylor Company, having given the bonds, were paid the proceeds of notes as collected. This cannot, however, properly delay the litigation here, for the Taylor Company, for their own purposes, took control of the notes, and assigned them. If Hatcher has become liable on any or all of these notes, it was the duty of the Taylor Company, by appropriate evidence, to inform the court. The court will not presume an indebtedness. The makers of the notes, in the absence of proof to the contrary, are presumed to have discharged them; but, if otherwise, we repeat it was incumbent on the Taylor Company to show it. It is evident from all the evidence in this case, notwithstanding the great explicitness of the written and printed contract stipulating that one-third cash should be paid, at no period was the Hatcher Company inhibited from making sales simply because the cash was wanting. Either by ratification, or by subsequent authority relating back, the Hatcher Company were practically authorized to do the best they could for their principals, and they seem to have done this. It is impossible, after reading such cogent evidence as the contemporaneous letters of Hatcher, of the several agents, and of the company itself, to doubt the earnestness and sincerity with which Hatcher pressed at the time the demands for performance and instances of injury which he now insists upon before the court. Nor is it capable of fair doubt that the Taylor Company, without saying so openly, were doing all in their power to break off their relations with the Hatcher Company and with little regard to their inter-

est. The Taylor Company appeal to the court for the exercise of its equitable powers in their behalf—they must themselves do equity. They must pay the Hatcher Company for their expenses legitimately incurred. They must pay the the profits which the Hatcher Company would have made by the engines they promised to deliver and which were refused. A reference will be made to a special master to make an accurate computation in accordance with this decision. In other respects the report of the master will stand confirmed, and a decree will be entered embodying the results of this holding.