PORTLAND CO. v. SEARLE

(Circuit Court, D. Maine. May 10, 1909.)

No. 41.

1. SALES (§ 52*)—BUYER—EVIDENCE.

Evidence *held* to warrant a finding that a contract of sale of certain railroad equipment, etc., was made with defendant's testator and on his credit, and not on the credit of certain railroad corporations in which testator was interested.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 138; Dec. Dig. § 52.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. SALES (§ 370*)—EXECUTORY CONTRACT—REPUDIATION—ACTION FOR BREACH.
    Where defendant, immediately after the death of his testator, who had contracted with plaintiff for certain railroad equipment, repudiated the contract before time for performance had arrived, the contract being executory, plaintiff was authorized to treat it as terminated and to sue at once for its breach.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. § 1085; Dec. Dig. § 370.*]

3. SALES (§ 384*)—BREACH OF CONTRACT—DAMAGES—PROFITS.
    In an action for breach of an executory contract for the construction and delivery of railroad equipment of a special character and gauge, prior to the time for delivery, the seller's measure of damages was his outlay and expenses, less the value of materials on hand and the profits which might have been realized by performing the contract.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. § 1098; Dec. Dig. § 384.*]

At Law.

Benjamin Thompson and Frederic J. Laughlin, for plaintiff.
Arthur P. Hardy and William M. Bradley, for defendant.

HALE, District Judge. In this action at law plaintiff seeks to recover of the defendant the contract price for the building of 50 log bunks and 6 sets of snow-plow irons, and also to recover damages by reason of the failure of Calvin Putnam, the defendant's testator, to carry out the provisions of the contract alleged to have been made by him with the plaintiff for the building of 25 flat cars. The plaintiff corporation is engaged in the building of cars and locomotives. At the time of the making of the alleged contract, Calvin Putnam was the owner of Redington township in Franklin county, Me. The evidence shows that in November, 1902, Mr. Putnam, who was then 87 years old, had contracted with the Berlin Mills Company to sell them certain timber upon Redington township; to build a railroad into that township to a point designated to the Berlin Mills Company by Fletcher Pope, and shown on a preliminary survey; to finish the road by December, 1903; to furnish a sufficient number of cars for hauling, during the logging season, the logs that might be cut under the terms of the contract with the Berlin Mills Company; and to haul all the logs cut under contract with the Berlin Mills Company to the place designated by the company. The Berlin Mills Company agreed, among other things, to cut, in the fall of 1903, and annually thereafter, from five to ten million feet of timber until the same had been removed in accordance with the contract, and to pay Mr. Putnam at a certain agreed price per thousand for the lumber. The company further agreed to loan Mr. Putnam, from time to time, an amount in money not to exceed $100,000, at 5 per cent. interest; of which $25,000 was to be paid at the execution of the contract, and the balance as the building of the road progressed. For the purposes of this case it is not essential to enter into further details of this contract. Another contract was made in the same month by Mr. Putnam with one Fletcher Pope, which recited that the contract had been made with the Berlin Mills Company, and that Mr. Putnam had agreed to engage and em-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ploy Mr. Pope as his agent, general manager, and superintendent "in the execution of all things to be done, and work to be performed, by said Calvin Putnam in his said agreement with said Berlin Mills Company; and to represent him and act for him in dealing with said Berlin Mills Company, and in the superintendence and management of all things to be done and observed by said Berlin Mills Company under their agreement with said Calvin Putnam in said contract." That contract further provided that Mr. Pope was to act under the direction and control, and conform to the wishes, of Mr. Putnam, the latter having the power during his lifetime to terminate the contract with Mr. Pope by 30 days' written notice. The contract undertook further to provide that, at the death of said Calvin Putnam, or in the event of his incapacity, from any cause, to manage his business, Pope should be empowered to manage all the property described in the contract with the Berlin Mills Company, "and to carry out and perform all the duties and obligations entered into and assumed by him therein and thereunder until such contract should have been fully performed by the respective parties"; and "to do and perform in his name, or in the name of the estate, all things necessary to be done to carry out and perform so much of said contract as should remain unexecuted in the event of such incapacity or at his decease." The contract also authorized Pope to "provide any and all material that from time to time might be necessary to meet the requirements of said contract and carry out its provisions, and to do any and all things necessary to be done to carry out said contract as fully and effectually as said Putnam could or should do if living." In this contract, Fletcher Pope agreed to act as the agent and general manager of Calvin Putnam, and to assume and execute all powers given in the contract, and to perform all work and services necessary and proper for him to perform as such agent and manager. Within a year from making this contract, the railroad, known as the "Eustis Railroad," was built, under the superintendence of Mr. Pope, from a point on the line of the Phillips & Rangeley Railroad into Redington plantation; and on January 13, 1903, Mr. Pope contracted with the Portland Company for 25 flat cars at the contract price of $6,875. These cars were afterwards paid for by Mr. Pope's checks on a deposit of moneys received from Mr. Putnam in connection with the building of the road. The Berlin Mills Company, under its contract with Mr. Putnam, advanced for the building of the road more than $100,000, all of which was paid to Mr. Pope by Mr. Putnam's order. The money so received was deposited by Mr. Pope in his own name in certain banks. The indebtedness incurred for the construction of the road was paid, so far as payments were made, by the personal checks of Mr. Pope on these banks.

In August, 1903, Mr. Pope contracted with the Portland Company for 25 more flat cars and 50 log bunks; the latter being for the express purpose of hauling out the lumber cut by the Berlin Mills Company on the Redington plantation. The 50 log bunks were built by the Portland Company, and $2,500 has been paid to the plaintiff company on this account by checks of Mr. Pope.

On November 19, 1903, Mr. Pope wrote the Portland Company:

"On the last order for flats you were not to begin until the first of December. Now we have been called upon to build six more miles of railroad and it is going to take more money than we had planned for and we would like to hold up the order for the 25 cars you now have a little while. We shall want the cars all right, but must make arrangements for the money first. We have been forced by circumstances to make these other extensions much sooner than we expected and have put the money into them which we intended to put into flats."

Neither Mr. Pope, nor the defendant, ever subsequently called for the cars; they were never ready to carry out that part of the contract; while the plaintiff says that it was always ready to perform its part of the contract.

On January 15, 1904, Mr. Putnam had a fall, and later the same year died in consequence of it.

After the death of Mr. Putnam there is no suggestion that Mr. Searle, as the executor of Mr. Putnam's will, ever offered in any manner to carry out the contract with the Portland Company relating to the flat cars; but, on the contrary, he refused to even recognize that part of the contract which relates to the log bunks which had been delivered and used during Mr. Putnam's lifetime in hauling out the timber cut by the Berlin Mills Company under its contract with Mr. Putnam. The plaintiff company offers testimony that the material which it had acquired in order to carry out the contract for flat cars was of comparatively little value in its partially manufactured state, owing to the fact that such material was for narrow-gauge cars, and that the patterns were of a class used on only one of the other narrow-gauge roads in this state.

This action is brought to recover the balance due on the log bunks, the value of the snow-plow irons which were intended for and used by the railroad constructed by Mr. Pope, and also to recover the damages sustained by the Portland Company in consequence of Mr. Putnam's failure to carry out the contract for the construction of the flat cars intended for that road.

1. To whom was the credit given? The defendant urges that the credit was given by the plaintiff, not to Calvin Putnam, but to the Phillips & Rangeley Railroad or to the Eustis Railroad; that the plaintiff corporation made the charge upon its books to the Phillips & Rangeley Railroad for the work done upon this contract; that Fletcher Pope's correspondence with the plaintiff was on letter heads of the Phillips & Rangeley Railroad or of the Eustis road; that he attached his signature as vice president and general manager of the Phillips & Rangeley Railroad; and that the plaintiff in its letters addressed him in that capacity.

It is unnecessary to enter upon a discussion of all the testimony. The whole evidence induces me to believe that the Portland Company sold wholly upon the credit of Mr. Putnam. Neither the Eustis Railroad nor the Phillips & Rangeley Railroad had any credit, and, although the memorandum of charge was made to the Phillips & Rangeley Railroad, the testimony is overwhelming that the actual credit was given to Calvin Putnam. The defendant admits that it was the intention of all parties that the money to be used in equipping the road

was the $100,000 to be obtained by Calvin Putnam from the Berlin Mills Company. The learned counsel for the defendant urge that what the plaintiff was really interested in was this $100,000 coming from the Berlin Mills Company. But it must be remembered that this $100,000 was to be the property of Calvin Putnam. The whole testimony is convincing that Mr. Pope was acting as the agent of Calvin Putnam in the whole transaction, and that the intention of all parties was that Calvin Putnam should be personally liable for the indebtedness incurred in equipping a railroad built for the sole purpose of selling his lumber in Redington township.

2. The evidence clearly shows that there was a contract made by Fletcher Pope as the agent of Calvin Putnam with the plaintiff for 25 flat cars at $275 each, and for 50 log bunks at $85 each. So far as the testimony indicates, there has never been any question raised but that the log bunks were built and delivered according to contract. The plaintiff has received from the defendant, through Fletcher Pope, $2,500 on account of them. The value of 50 log bunks, at $85 each, is $4,250; deducting the payment of $2,500, leaves $1,750 remaining due upon this item. The testimony shows that there were six sets of center snow-plow irons sold and delivered by the plaintiff for use on the same road, and that they were of the value of $16.86.

With reference to the flat cars, the correspondence, taken in connection with the rest of the testimony, induces the belief that there was a legal contract with the defendant for 25 flat cars at the price of $275 each; that, after making the contract, Mr. Payson, the agent of the plaintiff, immediately proceeded on the work by ordering the material for constructing the cars; that this material consisted of lumber, car wheels, axles, refined iron, and all the other materials that the company itself makes. These materials were of a peculiar character, owing to the fact that the road was of a narrow gauge and differed from standard roads; for this reason there was no general sale for flat cars of such design; nor was there any sale for such materials, from the fact that they had been adapted to meet the requirements of patterns for the particular contract to which I have referred. Mr. Payson, the manager for the plaintiff company, says that the flat cars were got ready for final assembling when the correspondence, to which I have alluded, occurred. This correspondence, with the subsequent action upon the part of defendant's testator, is sufficient evidence of the breach of the contract. For there can be no doubt that where either party to an executory contract annuls it without cause, and before the time for performing it elapses, he authorizes the other party to treat it as terminated, without prejudice to a right of action for damages; and the party whose duty it was to deliver the goods under the contract may elect to treat the contract as terminated, and bring his action at once.

3. What, then, is the measure of damages for nonperformance of the contract? Such damages must be compensatory; they must represent the amount of the loss which the plaintiff has sustained. In United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168, the court held:

"When one party enters upon the performance of a contract, and incurs expense therein, and, being willing to perform, is, without fault of his own, prevented by the other party from performing, his loss will consist of two distinct items of damage: First, his outlay and expenses, less the value of materials on hand; second, the profits he might have realized by performance, which profits are related to the outlays and include them and something more. The first item he may recover in all cases, unless the other party can show the contrary; and the failure to prove profits will not prevent him from recovering it. The second he may recover when the profits are the direct fruit of the contract, and not too remote or speculative."

In speaking for the court, Mr. Justice Bradley said:

"The prima facie measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely: First, what he has already expended towards performance (less the value of materials on hand); secondly, the profits that he would realize by performing the whole contract."

The Behan Case contains a clear statement by the Supreme Court of the rule of damages. The rule in that case is only one aspect of the general rule; it is the rule applicable to a particular class of executory contracts, where the plaintiff has been put to great expense in providing peculiar materials for fulfilling the contract, has expended labor thereon in adapting them to the contract, and, without his fault, has been prevented from carrying out and completing the contract. The following cases are also in point: United States v. Speed, 8 Wall. 77, 19 L. Ed. 449; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, affirming 91 Fed. 345, 33 C. C. A. 550; Taylor Mfg. Co. v. Hatcher Mfg. Co. (C. C.) 39 Fed. 440, 3 L. R. A. 587; McElwee v. Bridgeport Land & Improvement Co., 54 Fed. 627, 4 C. C. A. 525; Anvil Mining Co. v. Humble, 153 U. S. 540, 552, 14 Sup. Ct. 876, 38 L. Ed. 814; Lovell v. Insurance Co., 111 U. S. 264, 274, 4 Sup. Ct. 390, 28 L. Ed. 423; In re Stern, 116 Fed. 604, 606, 54 C. C. A. 60; Michigan Yacht & Power Co. v. Busch, 143 Fed. 929, 934, 75 C. C. A. 109; Wells v. National Life Association of Hartford, 99 Fed. 222, 228, 39 C. C. A. 476, 53 L. R. A. 33; Hetzel v. Baltimore & Ohio R. R. Co., 169 U. S. 26, 18 Sup. Ct. 255, 42 L. Ed. 648.

In the case at bar, Mr. Payson, the manager of the plaintiff corporation, testifies as to the necessary expenditures for the performance of the contract. He makes a statement of the cost of the various articles of lumber, iron, and other materials which were indispensable in building the flat cars. He takes into account the labor expended upon these materials in order to adapt them to their use. He produces a tabulated statement of the cost of the materials and of their present value. By agreement of counsel, this schedule has been received in evidence as a statement of the loss sustained. Upon a careful examination of the whole testimony, it appears that the plaintiff's outlay and expenses, less the value of materials on hand, together with the profits which he would have realized by the performance of the contract, amount to a sum larger than the $3,500 claimed by the plaintiff as the damage occasioned by reason of failure to complete the flat-car contract. The tabulated statement, to which I have referred,

and the testimony of Mr. Payson, make a prima facie case of the amount of damage which his corporation has suffered by the defendant's failure to carry out the contract. The defendant has offered no evidence that the plaintiff has not been damaged to the extent to which its witnesses have testified, nor has he introduced testimony tending to show that the plaintiff incurred unnecessary expense for the purpose of carrying out the contract, nor has he sought to prove in any way that the plaintiff's evidence respecting profits is incorrect.

The plaintiff is entitled to recover the balance due on the 50 log bunks, namely, the contract price, $4,250, less the payment on account, $2,500, namely, $1,750. To this is added the six sets of snow-plow center irons, $16.86—$1,766.86. As I have already indicated, I allow also the loss occasioned by the reason of failure to carry out and complete the flat-car contract, $3,500. Total, $5,266.86. To this should be added interest from the breach of the contract, $1,685.39.

Judgment may therefore be entered for the plaintiff for the sum of $6,952.25.