## EXCELSIOR MOTOR MFG. & SUPPLY CO. et al. v. SOUND EQUIPMENT, Inc.*
### No. 5145.

Circuit Court of Appeals, Seventh Circuit.
Nov. 15, 1934.

George A. Chritton, Charles J. Merriam, Jules L. Brady, Samuel A. Harper, John E. Hughes, and Dyrenforth, Lee, Chritton & Wiles, of Chicago, Ill., for appellants.

Ralph F. Potter, George C. Bunge, and Leslie H. Vogel, all of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and FITZ-HENRY, Circuit Judges.

FITZHENRY, Circuit Judge.

This is an appeal from a judgment of the District Court in favor of appellee in an action at law for damages for breach of contract. A jury was waived and the cause tried by the court, who filed findings of fact and conclusions of law and awarded a judgment for $106,500 and costs in favor of appellee.

The contract in suit was made on March 23, 1929, between appellee, Sound Equipment, Inc. and appellants, Excelsior Motor Mfg. & Supply Company and the Dramaphone Corporation, Inc., both Illinois corporations. Paragraph 3 of the contract is set forth in the margin.[1]

Prior to the making of the contract in suit there had been some business transacted, covering a period from December, 1928, to March, 1929, between appellee, or its organ-

---

[1] The Distributor agrees to purchase, and Dramaphone and Excelsior agree to manufacture, sell and ship to said Distributor, twenty-five (25) Complete Dramaphone Equipments as hereinafter defined and described, said lot of twenty-five (25), as aforesaid, to be delivered as follows: Five (5) between date of this contract and April 25, 1929; Four (4) between May 15, and May 23, 1929; Four (4) between June 15, and June 25, 1929; Four (4) between July 15 and July 25, 1929; Four (4) between August 15 and August 25, 1929; and Four (4) between September 15 and September 25, 1929; and the Distributor agrees that upon notice from Excelsior, given within each of these respective shipping periods, that said installment shipments are ready for equipment, to pay, in cash, to said Excelsior the full purchase price as hereinafter provided for each said installment shipment.

Dramaphone and Excelsior further agree to manufacture for, sell and ship to the Distributor any Complete Dramaphone Equipments ordered by said Distributor, in addition to the original twenty-five (25) above provided for, and agrees to ship such additional Complete Dramaphone Equipments, as ordered, within twenty (20) days from receipt of shipping instructions given by said Distributor, and as to all such additional equipment so ordered, the Distributor agrees to pay fifty (50) per cent. of the purchase price at the time the order is placed, and the balance by a thirty (30) day trade acceptance bearing date of the day of shipment, and any failure to pay a trade acceptance shall relieve Excelsior from making further shipments hereunder, and if such default in payment continues for twenty (20) days after said acceptance is due, Excelsior may cancel this contract by a notice, in writing, which notice shall be ineffective if said acceptance be paid in ten (10) days after the service of such notice, provided, however, that Dramaphone and Excelsior shall not be required, under the terms of this paragraph, to manufacture and deliver to Distributor on orders of the latter, more than twenty (20) Complete Dramaphone Equipments during any period of twenty (20) days.

The Distributor agrees to pay, and Dramaphone and Excelsior agree to accept, up to October 1, 1930, in payment for each Complete Dramaphone Equipment sold and delivered to it as hereinbefore provided by Dramaphone and Ex-

izers and officers, and appellant Dramaphone Corporation, Inc.

As early as December, 1928 the Dramaphone Corporation had produced a successful "synchronous and non-synchronous" disc equipment for the purpose of producing sound in motion picture theaters. It was endeavoring to perfect a film head or "sound on film" device to be used in connection with its disc machine, but had not yet succeeded in doing so. At that time picture producers were manufacturing sound films both by disc and "film track" methods and a well equipped theater required a machine that could show either type.

A contract was entered into on December 20, 1928, under the terms of which the Dramaphone Corporation was to manufacture and Henigson and Schlank (who later organized Sound Equipment, Inc.) were to have the exclusive agency for selling and distributing the Dramaphone sound reproduction machine in the territory west of Denver. The Dramaphone Corporation agreed to have the film head device ready in sixty days and Henigson and Schlank paid $5,000 on account of the first Dramaphone machines to be delivered. Sound Equipment, Inc., a California corporation, was subsequently organized and a sales organization established which began to canvass the territory for orders for the Dramaphone machine. A Dramaphone disc machine was installed in the Wilshire Theatre of the Fox West Coast theater chain at Los Angeles upon the condition that the film pick-up device would be added within fifty days and if the equipment was found to be satisfactory, the Fox West Coast Theatres, Inc., would purchase that and additional machines. There followed a period in which Sound Equipment vainly sought to secure the promise of a definite date on which it could make deliveries of the film head device. In February, 1929, this first agreement was supplemented by a second between the same

parties, by which Dramaphone agreed to manufacture and ship, and Sound Equipment agreed to purchase, a minimum of twenty-six equipments, including film heads which Dramaphone Corporation agreed to have ready not later than March 25, 1929. On the strength of this new agreement, Sound Equipment made three sales calling for sixty-day delivery and entered into a subdistributor contract with another concern. It soon became apparent, however, that the Dramaphone Corporation would not be able to construct this equipment as it had agreed to do.

On or about March 16, 1929, a contract was entered into between the two appellants herein, by which it was agreed that Excelsior Motor Mfg. & Supply Company would thereafter manufacture the sound equipment devices which the Dramaphone Corporation had partially perfected, and that they would be sold by the Dramaphone Corporation on the basis of a division of the profits at the rate of 60 per cent. to the Excelsior Company and 40 per cent. to the Dramaphone Corporation.

On March 23, 1929, the contract here in suit was entered into wherein the previous agreements between the Dramaphone Corporation and Sound Equipment were canceled. Appellee was given an exclusive agency in certain western states. Dramaphone and Excelsior agreed to manufacture and deliver to appellee a minimum of twenty-five equipments, complete with sound heads, at a price of $2,000, and additional equipment at not exceeding twenty in any twenty days at the same price until October 1, 1930.

While awaiting shipment of the first Dramaphone, appellee continued to employ a sales manager and to maintain the interest of the trade, but took no more orders. No machines were ever delivered under the contract and appellee was compelled to cease operations.

---

celsior, (including not only the original lot of twenty-five (25), but as well any additional Complete Dramaphone Equipment ordered by the Distributor as aforesaid), a sum equal to fifty (50) per cent. of the price nationally advertised by Dramaphone and Excelsior for said Complete Dramaphone Equipment at the time said order is placed, but in no event, up to October 1, 1930, shall the price per Complete Dramaphone Equipment to the Distributor be in excess of Two Thousand Dollars ($2,000) per each Complete Dramaphone Equipment, as specified in Par. 5 hereof, said price to be on a ba-

sis of f. o. b. Chicago and to be properly packed or crated and delivered to a common carrier, free of expense to Distributor, for shipment in accordance with shipping instructions given by Distributor. The price after October 1, 1930, shall be subject to adjustment by and between the parties hereto. It is understood and agreed that the present advertised price for a Complete Dramaphone Equipment is Four Thousand Dollars ($4,000.00) and Excelsior shall from time to time notify the Distributor of any change in such nationally advertised price.

728

The issues raised on this appeal will be considered under four points: (1) Whether the amendment to the contract releasing appellants from liability was in fact a force majuere clause or one releasing appellants from liability for failure to perform for any reason, except for a lack of good faith in the execution of the contract. (2) Was the contract void as contravening the Clayton Act (38 Stat. 730)? (3) Was the contract ultra vires the charters of both appellant corporations and therefore not binding upon them? (4) Was the evidence sufficient to furnish a basis for the judgment rendered for loss of profits?

■ (1) The contract in suit contained the following provision:

"It is mutually agreed that no damage shall be claimed by any party hereto against any other for failure to carry out any provision herein made binding, provided such failure shall be occasioned by fire, strikes, lockouts, or any other cause beyond the control of the party so in default."

It was contended by appellants that this clause in the contract was intended by the parties to cover, and it did cover, insurmountable difficulties in perfecting a commercially practicable "sound on film" device, and also the impossibility of furnishing such a device because of outstanding patents for which licenses could not be secured.

The District Court properly held:

"The legal construction of the last paragraph or addenda of or to the contract between the parties hereto * * * does not include inability to perform the contract by the defendants by reason of mechanical defects, engineering difficulties, defects in design or patent infringements. * * * the words 'or any other cause beyond the control of the party so in default' must be construed to mean similar casualties or occurrences such as fire, strikes and lock-outs."

The mere reading of this clause is ample to dispose of the contention, in the light of the innumerable decisions of the courts.

■ (2) It is difficult to believe that appellants are serious in arguing that the contract in suit violates the Clayton Act because it fixes a resale price and provides that Sound Equipment shall not deal in the products of any competitor. Such contracts violate the Clayton Act only if their effect is "to substantially lessen competition or tend to create a monopoly in any line of commerce." Section 2 (15 USCA § 13). The evidence amply supports the finding of the trial court

that the contract in suit did not violate the Clayton Act. On the contrary, had appellants carried out the provisions of the contract and produced a successful machine at the price fixed, it would have tended to introduce some competition into a field where Western Electric Company had, by virtue of its being the first company to produce a commercially practical equipment, a virtual monopoly.

■ (3) In respect to the contention that the contract in suit was ultra vires the appellant corporations because corporations have not the power to enter into a contract of partnership, we cannot agreed that the contract in suit creates a partnership relation between the parties. Neither the provision for the division of profits, nor the other provisions of the contract are sufficient to constitute a partnership. Fechteler v. Palm Bros. & Co. (C. C. A.) 133 F. 462, 468, 469; White Star Line v. Star Line of Steamers, 141 Mich. 604, 105 N. W. 135, 113 Am. St. Rep. 551; McTigue v. Arctic Ice Cream Supply Co., 20 Cal. App. 708, 130 P. 165; Geurinck v. Alcott, 66 Ohio St. 94, 63 N. E. 714; Paris Mercantile Co. v. Hunter, 74 Ark. 615, 86 S. W. 808.

The contract in suit is one for a joint commercial venture and there can be no doubt of the capacity of the parties to enter into such a contract. Clinchfield Fuel Co. v. Henderson Iron Works Co. (C. C. A.) 254 F. 411; Luhrig Collieries Co. v. Interstate Coal & Dock Co. (D. C.) 281 F. 265; Transcontinental Oil Co. v. Mid-Kansas Oil & Gas Co. (C. C. A.) 29 F.(2d) 323.

■ (4) The record discloses ample evidence to support the finding of the trial court that there was actual damage suffered by appellee and that the cause of this damage was the failure of appellants to deliver the machines which they had contracted to manufacture and deliver. Some sales were actually made, substantial payments made on account, and there was a ripe market demand for the product, and the evidence fully supports the finding of the trial court that many sales were lost through the failure of appellants to deliver machines.

The real question is whether, the cause and existence of the damage having been established, recovery must be denied because of the difficulty of accurately ascertaining the full measure and extent of the damage suffered.

The general rule is that where profits are lost as the result of a breach of contract, if the profits were in the contemplation of

729

the parties and there is some rational basis shown for determining such profits, they may be recovered as damages. Gasoline Products Co. v. Champlin Refining Co. (C. C. A.) 39 F.(2d) 521; Hoffer Oil Corp. v. Carpenter (C. C. A.) 34 F.(2d) 589; Howard v. Stillwell & Bierce Mfg. Co., 139 U. S. 199, 11 S. Ct. 500, 35 L. Ed. 147; Eckington & S. H. R. Co. v. McDevitt, 191 U. S. 103, 24 S. Ct. 36, 48 L. Ed. 112; Fidelity & Deposit Co. v. L. Bucki & Son Lumber Co., 189 U. S. 135, 23 S. Ct. 582, 47 L. Ed. 744; United States v. Behan, 110 U. S. 338, 345–347, 4 S. Ct. 81, 28 L. Ed. 168; Cincinnati S.-L. Gas Illuminating Co. v. Western S.-L. Co., 152 U. S. 200, 14 S. Ct. 523, 38 L. Ed. 411; Anvil Mining Co. v. Humble, 153 U. S. 540, 14 S. Ct. 876, 38 L. Ed. 814; Prejean v. Del-La. Fur-Trapping Co. (C. C. A.) 13 F. (2d) 71; Texas Co. v. Pensacola Maritime Corp. (C. C. A.) 292 F. 61; Hollweg v. Schaefer Brokerage Co. (C. C. A.) 197 F. 689, 700; Northwest Auto Co. v. Harmon (C. C. A.) 250 F. 832, Ann. Cas. 1918E, 461.

The law of damages is clear. The difficulty lies in the application of the law to the facts in particular cases. It is not required that the profits be definitely and absolutely proved. The breach of the contract having prevented such profits from being made, conclusive proof is impossible. The injured party is permitted to introduce evidence tending to establish the damage and no greater degree of certainty of proof is required than for any other fact essential to be established in a civil action.

It has been held that damages for the interruption of a going business with consequent loss of profits may be recovered where proof is introduced as to the amount of profit made in the past during a like period together with facts that the circumstances have not so changed as to alter the prospects of equal profits during the time in question. Taylor Mfg. Co. v. Hatcher Mfg. Co. (C. C.) 39 F. 440, 3 L. R. A. 587; Prejean v. Delaware-Louisiana Fur-Trapping Co. (C. C. A.) 13 F.(2d) 71. This does not mean that only those profits which are lost by an established business may be recovered. This is only one method by which the loss may be proved with sufficient certainty.

In the instant case the evidence showed that at this particular period sound reproduction equipment became an essential part of the equipment of every motion picture theater that expected to remain in business. Only a few theaters were so equipped and the companies which were producing even reasonably successful equipment were selling them faster than they could be manufactured. One witness testified that during this period salesmen were not necessary, only order takers, and the testimony of the other witnesses is to the same effect though stated in other words. One of appellee's witnesses testified:

" * * * They would buy Qualitone or R. C. A. or the De-Forest. Anything that would make sound they would grab for.

" * Between fifty and sixty of these customers whom I had contacted and whom we figured would have bought from us, purchased other equipment * * * from April to the latter part of May."

The witness Levinson, who was at that time Western division manager for Electrical Research Products, Inc., a subsidiary of Western Electric Company, testified:

"There were times when we were selling as much as seven months ahead. * * * A lot of exhibitors brought their orders into our office or telegraphed us 'How much money shall we send'. * * * We were very busy at that time with this business. I never got home day or night, nor did the rest of my force. Our office was bright nearly all night. All of our field staff were on the fire alarm basis."

Witness Feldstein testified:

"At that time there were not enough sound equipments of all makes on the market in this territory available to be delivered to satisfy the demand. If Sound Equipment, Inc., had had any kind of a delivery date that it could promise for delivery of a complete Dramaphone machine, they would have been in just as good a position to sell machines as they would have been in January, 1929, provided they could complete the machine with the movietone or sound-on-film apparatus.

"There were not enough sound reproducing equipments, disc or film, on the market here in this territory to satisfy the demand; no company had any machines uninstalled waiting for sales."

From this and other evidence in the record, it is clearly shown that the circumstances in this case were entirely different from those which are usual where a new and untried product is placed upon the market and where the number of sales, if any, are extremely speculative. Here we have a new product. But it was a product brought into existence by an unprecedented demand. That it would have sold, and in large quantities, is quite as conclusively shown as though it were a well-known product with an established market.

There was competent evidence as to the number of machines which would have been sold. In the case of Daughetee v. Ohio Oil Co., 263 Ill. 518, 105 N. E. 308, 311, the Supreme Court of Illinois said:

"The rule is that, while the law will not permit witnesses to speculate or conjecture as to possible or probable damages, still the best evidence of which the subject will admit is receivable, and this is often nothing better than the opinion of well-informed persons upon the subject under investigation."

See, also, Julian Petroleum Corp. v. Courtney Petroleum Co. (C. C. A.) 22 F. (2d) 360; Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U. S. 689, 697, 53 S. Ct. 736, 77 L. Ed. 1449, 88 A. L. R. 496.

Appellants had contracted to deliver a satisfactory equipment, and the finding of the trial court that appellee would have sold sixty-seven of such equipments during the period considered, had the contract not been breached by appellants, is amply sustained by the record. The estimates of the different witnesses varied, but the finding of the trial court is a conservative deduction from the evidence introduced upon the subject.

A great many subordinate points are raised by appellants in their brief, but each of them is necessarily involved in the four important questions raised upon this appeal. Holding as we do as to them, it is unnecessary to discuss the subordinate questions.

The judgment is affirmed.