### CLINCHFIELD FUEL CO. v. HENDERSON IRON WORKS CO.
### SAME v. HENDERSON.

(Circuit Court of Appeals, Fifth Circuit. November 21, 1918.)

#### No. 3264.

1. JOINT ADVENTURES ☞1—CONTRACTS—CONSTRUCTION.

A corporate shipowner and a company operating a tug owned by the corporation *held* joint adventurers, responsible for one-half of the expenses and losses; it appearing that the corporation which contracted with one interested in the operating company recognized the company's rights.

2. CORPORATIONS ☞432(12)—CONTRACTS—EVIDENCE OF AUTHORITY.

Evidence of a contract relating to a tug owned by a corporation entered into by the president and general manager *held* to show it was made for the corporation, binding on the corporation.

3. CORPORATIONS ☞447—CONTRACTS—VALIDITY.

Where a corporation, which under its charter might build vessels, acquired a tug in the discharge of a debt, a contract relating to the operation of the tug was not ultra vires.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. CORPORATIONS ⬩⬩⬩379—CONTRACTS—PARTNERSHIP AGREEMENT.

Where the stockholders and officers of a corporation acquiesced in a contract between it and another for the joint operation of a vessel, *held*, that the corporation could not escape resulting liability on the ground that the contract was one of partnership and a corporation cannot be a member of a firm.

5. CORPORATIONS ⬩⬩⬩423—TORTS—NEGLIGENCE—AUTHORITY OF OFFICERS.

Where the officer in charge of a corporation's business entered into a contract for the operation of a tug which it owned, *held*, that the corporation could not escape responsibility for the results of a collision due to negligent operation, on the ground that no person was authorized to so conduct the business of the corporation as to impose upon it liability for negligence.

6. CORPORATIONS ⬩⬩⬩306—LIABILITY OF OFFICERS—ILLEGAL ACTS.

Where the president and general manager of a corporation entered into a contract with respect to the operation of a tug which the corporation owned, and the contract was beyond his authority, he would be personally responsible.

7. COLLISION ⬩⬩⬩153—REVIEW—DETERMINATION.

Where the trial court found against a libelant, seeking to recover on account of collision on the ground that the respondent was not a person responsible, but did not determine the question of negligence, the appellate court, on reversing the decree, will not, regardless of its authority to consider the record, determine the question of negligence, but will remand the case to enable the trial court to determine such question.

Appeal from the District Court of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Libel by the Clinchfield Fuel Company against the Henderson Iron Works Company, together with a like libel against Frank Henderson. The two cases were tried together, and, judgment being against libelant in each case, it appeals. Decree reversed as to the Henderson Iron Works Company, and affirmed as to the individual respondent.

Harry T. Smith and Wm. G. Caffey, both of Mobile, Ala., for appellant.

T. M. Stevens, of Mobile, Ala., for appellees.

Before WALKER and BATTS, Circuit Judges, and EVANS, District Judge.

BATTS, Circuit Judge. The Clinchfield Fuel Company filed a libel against Henderson Iron Works Company for injuries alleged to have been caused by the negligence of the master and crew of the tug Helen Henderson, owned by respondent. Upon denial of liability by respondent, a like libel was filed against Frank Henderson. The two cases were tried together, judgment being against libelant in each case.

At the time of the accident the Helen Henderson was being operated by the Steele Towing & Wrecking Company in the harbor at Galveston, Tex. The tug was towing a barge of the Clinchfield Fuel Company, and, according to the allegations of the bills, "the master and crew of the tug so negligently went about the performance of their duties" as to collide with a pier, and subsequently to ram a steamer; the collisions resulting in injuries to the barge.

⬩⬩⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The judgment of the court was upon the ground that, at the time of the accident, the vessel was under the complete control and management of the Steele Towing & Wrecking Company; and it is now insisted that the respondent corporation had relations alone with T. J. Anderson, and none with the Steele Towing & Wrecking Company.

[1] The contract, signed by T. J. Anderson and Frank Henderson, of importance in determining the relationship between the Steele Towing & Wrecking Company and the Henderson Iron Works Company, was to the following effect:

"This contract, entered into and between T. J. Anderson, partner in the firm of Steele & Anderson, of Galveston, Texas, and Frank Henderson, of the firm of the Henderson Iron Works Company, of Mobile, Alabama, this first day of June, 1915, to wit:

"In consideration of the said Frank Henderson furnishing his tug Helen Henderson, her tackle, apparel, and machinery, for operation along the coast of the Gulf of Mexico, and particularly in the harbor of the port of Galveston, Texas, he agrees to divide the net profits and to assume all cost and liabilities of operation of the said tug to the extent of fifty per cent. (50%), both profit and expense.

"The said T. J. Anderson, as one of the principals of the firm of Steele & Anderson, agrees to keep the said tug Helen Henderson in operation, endeavoring to secure all the profitable employment that he possibly can, both in the harbor and on the outside, maintaining thereon a single or double crew as the necessity might demand, and agrees on behalf of the firm of Steele & Anderson to be responsible for fifty per cent. (50%) of the costs and expenditures of operation in lieu of receiving fifty per cent. (50%) of the net profits of the tug.

"It is further mutually agreed by the parties signing this contract and constituting the principals of this contract that the tug will be operated under the name of the Steele Towing & Wrecking Company, although the direct management shall be in the hands, and all transactions passed through the hands, of the said T. J. Anderson on behalf of the firm of Steele & Anderson.

"All fuel, provisions, wages and any disbursements whatsoever are to be paid for by the said firm of Steele & Anderson, and in the event of loss or profits the division to be made in accordance with that portion of agreement relating as above.

"Witness my hand this first day of June, 1915, at the city of Galveston, Texas, U. S. A.

"This contract can be broken by either party (60) days after written notice.

"T. J. Anderson. [Seal.]

"Signed in the presence of:
    "Henry J. Schutte.

"Witness my hand this first day of June, 1915, at the city of Mobile, Alabama, U. S. A.                                    Frank Henderson.

"Signed in the presence of:
    "Adolph Danne."

The contract is one difficult to construe. The intention of the parties is set forth in terms uncertain and ambiguous. It is provided that the tug would be "operated under the name of the Steele Towing & Wrecking Company, although the direct management shall be in the hands, and all transactions passed through the hands, of the said T. J. Anderson." From this provision, from the correspondence, and from the testimony of Anderson, it sufficiently appears that the Henderson Iron Works Company, having peculiar confidence in Anderson, expected him to look after the interests of the Henderson Company, but that the actual operation was to be by the Steele Towing &

Wrecking Company. The possibility of a sale to this company was in contemplation, and insurance was effected, payable to the Steele Towing & Wrecking Company, "as its interest may appear." One of the letters from Anderson contained a sentence to this effect:

"The contract I contemplate writing up in connection with your good self and this office will be in such manner as will give the Steele Towing & Wrecking Company no hold on you whatever, thereby fully protecting you by dealing exclusively through my office."

In another letter Henderson Iron Works Company suggest:

"I would prefer doing business through your office, whom I am well acquainted with, although I believe the Steele Towing & Wrecking Company are first-class, honorable people; but, as you are better acquainted with both sides, this is my reason for expecting you to protect us."

Anderson testified that when the tug went to Galveston he turned her over to the Steele Towing & Wrecking Company to operate; that he and Henderson "conferred and co-operated in suggestions for the betterment of the operations after the Steele Towing & Wrecking Company took charge of her"; that "the vessel was not chartered at so much a month," but "on the mutual understanding that all profits were to be divided as between owners and Steele Towing & Wrecking Company."

Whatever may have been the original understanding and the meaning of the contract, it is quite certain that Mr. Henderson and the Henderson Iron Works Company knew of the actual operation of the tug by the Steele Towing & Wrecking Company, and looked to that company for its part of the profits. Among the letters introduced in evidence was one in which the Henderson Iron Works Company says:

"We have been trying hard to get a settlement with the Steele Towing & Wrecking Company for the tug Helen Henderson's earnings from the last statement up to the time she sunk."

The conclusion reached is that the Henderson Iron Works Company and the Steele Towing & Wrecking Company were, at the time of the accident, engaged in a joint venture, each party undertaking to become responsible for one-half the expenses and losses, and to equally share in the profits.

[2] It is contended that there was no corporate action of any kind with reference to the operation of the vessel or the assumed contract with Steele Towing & Wrecking Company. The incorporators of the Henderson Iron Works Company were Frank Henderson, who subscribed for 25 shares, William Henderson, his brother, who subscribed for 1 share, and Maud Henderson, the wife of William Henderson, who subscribed for 24 shares. The incorporators were the directors, Frank Henderson was president and general manager, and William Henderson secretary. The complete control of the corporation's business was in Frank Henderson. His brother was a practicing physician, and the only thing to indicate that he ever had anything to do with the corporation was a statement by Frank Henderson that "on matters of importance we always consult one another." In the active management of the business he did not participate. The pres-

ident and general manager thought that the company had by-laws, but did not know where they were.

There is nothing to indicate that formal action had ever been taken by the board of directors in any matter pertaining to the conduct of the business of the corporation. In making the arrangement with reference to the operation of the tug, the corporation acted in the same way that it ordinarily did, through Frank Henderson alone. From the circumstance that the tug belonged to the Henderson Iron Works Company, that in the contract Henderson was spoken of as "of the Henderson Iron Works Company," that the letters with reference to this transaction were signed "Henderson Iron Works Company, by Frank Henderson, President," that there was no claim of ownership of the tug by Frank Henderson, and nothing to indicate that any arrangement had been made between him and the corporation by which the tug could be used for his sole benefit, it must be assumed that the contract was made for the corporation, and it must be held that it was so done as to bind the corporation.

[3] Further contention is made that, if there was a contract between the Steele Towing & Wrecking Company and the Henderson Iron Works Company, whereby a partnership between the two corporations for the operation of the tug resulted, the contract was ultra vires.

The Henderson Iron Works Company was a corporation, the objects of which were set forth in the charter as follows:

"To conduct a general foundry, machine shop, boiler, and blacksmith business, or any one or more thereof; to buy, manufacture, and sell all kinds of material, marine and railway machinery and supplies; to buy, manufacture, and sell all kinds of iron and other metal goods; to build or repair engines, vessels, boilers, sawmill and other machinery, and generally to do any and all acts incident to the operation of a general foundry, machine, boiler, and blacksmith shops."

The powers of the corporation were very broad, and the ownership of a vessel was a possibility contemplated. The tug was acquired in the discharge of a debt due the company. It could not be said that the company was without authority to acquire a vessel under such circumstances, when it had power to build and repair vessels. The ownership of a vessel carries along with it the right to use it in a way that will make it a source of revenue, instead of loss. The vessel had brought expense and loss, and the arrangement made was the result of an effort to make it profitable.

[4] The proposition is made that a corporation cannot become a member of a partnership. Doubtless there are many expressions in the books to this effect. Whether a corporation may become a technical partner or not, there is no doubt of its capacity to enter into commercial ventures within the general scope of its corporate powers, whereby the profits or losses of the enterprise are to be divided between the corporation and another person or corporation. Having the right to own and operate the vessel, it had the further right to make a reasonable and not extraordinary arrangement by which this operation could be effected. The rules of law with reference to corporate power will, in a measure, be dependent upon the persons by

whom they are invoked, and the circumstances under which an effort is made to apply limitations of authority. In the instant case, a close corporation, under the complete management of one of the incorporators, enters into an enterprise with another concern, with the expectation of making profit, under a contract whereby expenses and profits are to be divided. It may be that some member of the corporation could have invoked a lack of authority of the corporation or of the president, to prevent such a contract, or to prevent the carrying of it out after it was made. But a court would hesitate to allow a corporation (all of its officers and stockholders acquiescing) to take the possible profits of an enterprise, under a contract beyond its powers, and then, liability resulting, permit it to secure immunity by an .appeal to lack of authority.

[5] The proposition is made that no person was authorized to so conduct the business of the corporation as to impose upon it liability for negligence or other tort. Of course, no corporation can lawfully authorize the doing of an unlawful act, or of a tortious or negligent act. Neither can an individual acquire a right to commit a tort; but the absence of the right to do that which is wrong will not absolve him from the consequences of the wrong. A corporation may authorize the doing of that which is within its corporate authority; and if, in the doing of this, the agents or agencies which it selects are, within the scope of their authority, guilty of negligence or other tort, the same rules (with exceptions not necessary to state) are applicable as would be applied to an individual.

[6] If Frank Henderson acted for the corporation without authority, under circumstances under which the corporation would not be bound, he would himself be responsible. The conclusion reached, however, is that that which he did was for the corporation, under circumstances making the corporation responsible for the results. Judgment for him was therefore proper.

[7] The trial judge has not determined whether, under the facts developed, injuries resulted to the barge of the libelant under circumstances fixing negligence upon the master and crew of the tug. While this court would have the right to consider the record, and determine this question, it is believed that more satisfactory results can be attained by referring the matter to the trial court.

The case against Frank Henderson is affirmed, and that against the Henderson Iron Works Company is reversed, for further action consistent with this opinion.