## LUHRIG COLLIERIES CO. et al. v. INTERSTATE COAL & DOCK CO.

### POSTON et al. v. FRANKEL BROS. et al.

(District Court, S. D. New York. March 24, 1922.)

**1. Courts ⬤⟿276—Creditors' suit for receiver to conserve assets need not be brought in state of domicile.**

A suit by creditors against a corporation for appointment of receivers to conserve its assets is not necessarily one to wind up the corporation, and need not be brought in the state of its domicile, but is essentially a suit in rem, and with the consent of the corporation may be maintained in any jurisdiction where there are assets to be conserved.

**2. Corporations ⬤⟿548(8)—Creditors' bill to conserve assets held to state a cause of action without alleging insolvency.**

A bill by creditors for the appointment of receivers to conserve the assets of a corporation need not allege insolvency, but states a cause of action in equity, if it alleges that the corporation is unable to meet its obligations as they mature and that, if its property is subjected to forced sales through threatened suits and attachments by individual creditors, its value will be largely sacrificed and it will be unable to pay its debts.

**3. Courts ⬤⟿264(3)—Court has jurisdiction of suit by its receivers to recover assets as ancillary.**

A suit by receivers of a corporation appointed by a federal court to recover assets of the corporation is ancillary to the original suit, and within the jurisdiction of the court, without regard to the citizenship of the parties.

**4. Compromise and settlement ⬤⟿22—Courts ⬤⟿270—Ancillary bill attacking settlement for fraud held sufficient, and suit maintainable in district of defendant's residence.**

A bill by receivers of a corporation set out a continuing contract between the corporation and defendants and alleged performance in part, that at the instance of defendants their statement of the account between the parties was accepted and a settlement made pursuant thereto, by which the corporation executed its notes to defendants and also a release of all claims, but that such statement was false and fraudulent, and prayed that it be set aside, the notes and release canceled, and an accounting taken under the contract. *Held*, that the bill stated a cause of suit in equity and was maintainable by the receivers in the district of defendants' residence, and in which the receivers were appointed, though it was not in the state of the corporation's domicile.

**5. Corporations ⬤⟿487(1)—Party to ultra vires contract cannot retain what he received thereunder.**

That a contract is ultra vires does not entitle either party to retain what he has received in its execution.

**6. Contracts ⬤⟿346(12)—Whether action was based on contract or in disaffirmance held immaterial.**

Whether an action is based on a contract or in disaffirmance of it is immaterial, where the same facts will support a recovery in either case.

**7. Compromise and settlement ⬤⟿19(1)—Suit to set aside for fraud held maintainable.**

That, on a settlement based on a statement of account by one party, such party promised to pay any sum found due on a future accounting, *held* not to defeat a suit by the other party to set aside the settlement for fraud and for cancellation of notes given in pursuance thereof.

**8. Evidence ⬤⟿73—Contract not presumed to intend to create partnership, where one of the parties is a corporation without power to enter into such relation.**

That the parties to a contract are to share the net profits of its performance is prima facie, but not conclusive, evidence that a partnership

was intended where the parties are individuals; but such intention should not be presumed where one of the parties is a corporation, without power to enter into a partnership.

9. Equity ⬥148(4)—Bill for accounting under contract held not multifarious.

A bill for an accounting under a contract for a joint adventure *held* not rendered multifarious by an allegation of a particular breach of the contract by defendants for which damages were claimed.

10. Joint adventures ⬥5(1)—Equity held to have jurisdiction of a suit for accounting.

Equity *held* to have jurisdiction of a suit by receivers of a corporation for an accounting, where, under a contract between them, the corporation delivered coal to defendants to be sold on a joint adventure.

11. Cancellation of instruments ⬥35(3)—Transferee of notes held proper party to suit for their cancellation.

To a suit by receivers of a corporation for an accounting under a contract by the corporation and also for cancellation of notes given by the corporation on an alleged fraudulent settlement, the payee of the notes, which was a corporation owned by the principal defendants, and their present holder, *held* proper parties defendant.

In Equity. Suit by the Luhrig Collieries Company and others against the Interstate Coal & Dock Company. On motions to dismiss ancillary bill by Elias McLellan Poston and John B. Johnston, receivers of the Interstate Coal & Dock Company, against Frankel Bros. and others. Motions overruled.

This case comes up on motions to dismiss in whole or part a bill of complaint in equity for various reasons and in various respects, as appears below. The bill was filed by the receivers of the Interstate Coal & Dock Company, who were appointed by this court on September 21, 1921. It is ancillary to a creditors' bill of the usual kind, in which the receivers were appointed, which prayed a sequestration of the assets of the corporation, an injunction against suits by creditors, and distribution among creditors, if it should be found necessary to close out the business.

The original bill depended upon diverse citizenship, and alleged that the plaintiffs therein were creditors of the defendant corporation, which was organized in Wisconsin, and had for a long time been engaged, in New York and elsewhere, in the business of buying and selling coal; that the defendant owned large interests in coal mines and coal apparatus, and a large amount of coal and other property, and that it was indebted to a large number of creditors, whom it was unable to pay; that certain of its property had been pledged, and that the pledgees were threatening to sell; that, although its property was large, much could not be quickly converted into cash, and it had not sufficient funds to meet its liabilities as they became due; that creditors were threatening to begin attachments and other proceedings to enforce their claims, and that some had already done so, to the detriment and loss of the other creditors of the defendant; that, unless receivers were appointed, a multiplicity of suits of various kinds all over the United States would arise, by which its assets would become subject to waste, to the great injury of its creditors and stockholders; that if receivers were appointed, with leave to continue its business, and its assets were not sacrificed by execution sales, they were enough to pay its liabilities and leave a residue for its stockholders, in the interest of both of whom its affairs should be administered by a court of equity.

To the bill was attached a schedule of assets, which showed that the corporation was insolvent, except for an item carried upon its books at some $3,000,000 for "intangible assets" and "development," the nature of which did not, however, appear further. To this bill the Wisconsin company appeared and by answer admitted the truth of its allegations, upon which the receivers were appointed.

The ancillary bill in suit was against Morris George, and Frank Frankel, constituting the firm of Frankel Bros., Ralph J. M. Bullowa, and the Universal Transportation Company. It alleged that one of the two receivers was a citizen of Ohio and the other a "resident" of New York, that the members of Frankel Bros. were "residents" of New York, and that the Universal Transportation Company was incorporated under the laws of that state. It then set up the pendency of the original bill, with the appointment of the receivers, and their authorization to bring the ancillary suit; that in April, 1920, an agreement annexed to the bill had been made by the Wisconsin company and Frankel Bros., the substance of which was as follows:

The corporation was able to furnish West Virginia coal for tidewater shipments, which the firm could transport and sell at foreign ports. The parties could therefore jointly purchase, transport, and sell such coal in foreign ports, all the profits from which might be equally divided between them. That in pursuance of that purpose the corporation agreed to deliver at Atlantic ports such coal as might be necessary to fill all export orders obtained by the firm, and the firm agreed to sell the coal so purchased at prices c. i. f. to be agreed upon between the parties. The firm agreed to furnish the necessary vessels and the corporation to pay the mine owners for all coal purchased, together with railway freight charges. The firm also agreed to make collections and see to the delivery of the coal at destination. The profits to be divided were to be computed as follows: From the gross sale price was to be deducted the cost, f. o. b. at the mines, the freights to tidewater, the maritime freights, all incidentals thereto, and actual office expenses. The corporation was to bear all expenses of routing and transportation, and the firm of soliciting and obtaining sales. The parties further agreed to form one or more corporations to assume the obligations of this "tentative agreement" and to assign it to such corporations when formed.

The ancillary bill further alleged that in pursuance of this contract the corporation bought large quantities of coal, which it shipped to the firm, who in turn shipped it to foreign countries and sold it. The firm from time to time paid money on account of such transactions, but the accounts were never adjusted between them until the 25th of April, 1921, when the corporation at the firm's request delivered three promissory notes, in the face value of about $100,000 payable to the defendant the Universal Transportation Company (all of whose stock was owned by the firm), and released the firm from any liability in respect of any transactions between them. This release was given upon representations made by the firm that the amount for which the notes were given was a proper balance of all the accounts between the parties, and upon the firm's promise to pay the corporation any sums which might on a future accounting be shown to be due. The notes so given are now held by the defendant Bullowa, who was attorney for the firm, and who, with the Universal Transportation Company, "claims or may claim some interest in said notes."

The corporation since then has learned that the representations made by the firm, on which the notes and release were given, were false, and known by it to be false when made, and were intended fraudulently to induce the corporation to accept the statement of account and execute the notes and release; that in fact the firm had fraudulently charged in the account many items which were not proper, and made false entries in their books to deceive the corporation, all of which was unknown by it when it made the settlement; that in October, 1920, the firm notified the corporation that they had procured large orders for coal at prices agreed upon, and in pursuance thereof the corporation bought a large amount of coal at such prices, and sent some to tidewater, whereupon the firm refused to accept the same, and the corporation was obliged to pay the cost so agreed upon and to dispose of the coal at a loss, which should be included in the accounting between them.

The bill prayed a cancellation of the accord of April 25, 1921, redelivery of the notes, and a general accounting under the contract.

The motions to dismiss were:

(1) For joining with the suit for an accounting the breach of contract in October, 1920.

(2) Because the bill alleged that the accord of April, 1921, had been accompanied by a promise by the firm to render a future accounting on any other true statement of the accounts; in the alternative to strike out either the allegations of fraud or the agreement to account.

(3) To dismiss so much of the bill as prayed that the firm should account for all sums on the accounting, because they could not be charged with anything more than profits.

(4) To strike out so much of the bill as alleged that the firm had converted money of the corporation.

(5) To dismiss the bill as multifarious, for joining a cause of action on the original contract with a suit for an accounting on the promise to account, which was a part of the settlement of April, 1921.

(6) To dismiss the bill as multifarious, because the two causes of equity mentioned in the fifth motion were joined with the breach of contract in October, 1920.

(7) To dismiss the bill because the contract had never been terminated.

(8) To dismiss the bill for lack of jurisdiction.

(9) To dismiss the bill, because not ancillary to the original bill.

(10) To dismiss the bill, because the corporation had no power to enter into the contract, the same being ultra vires.

(11) To dismiss the bill, because this court had no jurisdiction to appoint receivers of a Wisconsin corporation.

(12) To dismiss the bill, because this court had no jurisdiction to appoint receivers of a foreign corporation on suit of nonresidents.

(13) To dismiss the bill, because the receivers appointed by this court had no power to bring such a suit.

(14) Because the bill was without equity.

(15) To dismiss the bill as to the defendants Bullowa and Universal Transportation Company, because no case was alleged against them.

Walter C. Noyes and Earl B. Barnes, both of New York City, for the motions.

Francis K. Pendleton, of New York City, opposed.

LEARNED HAND, District Judge (after stating the facts as above). [1, 2] I shall begin with the point of jurisdiction, which may for convenience be divided into three parts: First, whether this court had jurisdiction of the original bill; second, whether this is a proper ancillary bill, within the jurisdiction of the court; and, third, whether the receivers appointed herein may sue upon such a claim.

The original bill is in a form exceedingly familiar in this district. It seeks the sequestration of the assets of a foreign corporation in the interest of their preservation. The defendant's chief objections to it are that it is invalid as a bill to wind up the business of the corporation, not being in the state of its incorporation, and that to stand at all it must allege insolvency. A suit by stockholders to wind up a corporation must, it is true, be brought in the state of its organization. Maguire v. Mortgage Co., 203 Fed. 858, 122 C. C. A. 83 (C. C. A. 2d). But the jurisdiction of this court over a bill like that at bar, though in substance it accomplishes the same result, depends upon quite another history and development. It is an evolution out of the judgment creditors' bill to supplement the writ of execution, and normally it is dependent upon judgment, execution, and return nulla bona. Pa. Steel Co. v. N. Y. City Ry. Co., 198 Fed. 721, 736, 737, 117 C. C. A. 503 (C. C. A. 2d); Amer., etc., Co. v. Amer., etc., Co. (D. C.) 275 Fed. 121. The practice, now so well settled, of proceeding without

these conditions precedent, and upon the consent of the debtor corporation, received final sanction in Re Metropolitan Railway, 208 U. S. 90, 28 Sup. Ct. 219, 52 L. Ed. 403.

The bill must, of course, have equity, and equity would not lie in the mere fact that the debtor could not presently pay. If there be leviable property, the debtor must suffer the fate common to those who have no quick assets. To enjoin collection by judgment and execution in such case would be to grant the debtor an extension because of its temporary embarrassments, and would strike at the very foundation of credit in a commercial community. Moreover, it would scarcely be enough to allege that the leviable assets were not enough, without also alleging that those available by ordinary creditor's bill would not, in addition, pay all claims. It is no reason for enjoining vigilant creditors from their legal remedies that others will be forced to resort to equity, provided all can in the end be paid. It is of no interest to a court of equity, any more than to a court of law, to protect a debtor against his creditors.

But if it appears that the assets of every kind are not enough to pay all creditors, if left to a general welter of attachments, executions, and separate creditors' bills, a different situation is presented. The corporation may well be solvent if its assets be nursed along, and insolvent if they be thrown to the creditors for piecemeal sale. Recognizing in such event that creditors' bills will in the end be necessary, though unsuccessful, equity will anticipate them by presently stepping in, in the interest of securing the greatest possible payment ratably for all creditors, since the protection of creditors is an interest of equity as well as law.

Therefore, while it is necessary to allege that the assets, if given no protection, will not be enough to pay all creditors, it is not necessary to allege that the corporation is presently insolvent, or even that, when properly managed, it will not have a surplus for distribution among stockholders; and for that reason it is not customary to allege insolvency, though it is customary more clearly than in the bill in suit to allege that the assets will not pay all, if abandoned to general waste by separate legal proceedings. Such bills may, of course, be abused by the collusion of the debtor and friendly creditors. They may be abused by the court's refusal to allow a present liquidation, disregarding the creditors' unqualified right to present payment, and preserving the property for the debtor, which is not entitled to more consideration than its creditors collectively think wise to give it. But that has nothing to do with the propriety of the bills as such; they form a necessary and important part of insolvency law, and are of unquestioned validity.

Clearly, then, it is irrelevant that the debtor be a nonresident, or that a strict winding up of its affairs by statute must take place at its domicile. Central Trust Co. v. McGeorge, 151 U. S. 129, 14 Sup. Ct. 286, 38 L. Ed. 98, is an authority for such a bill against a nonresident, because the facts were quite on all fours with this. It is true that this precise point was not discussed, but the ruling could not have been made, had the suit been nonjusticiable in the District Court. Scattergood v. Amer., etc., Co., 249 Fed. 23, 161 C. C. A. 83 (C. C. A. 3d),

was in turn a similar case, where, indeed, there was no charge of more than financial embarrassment. While that case may have depended in this respect on the law of Pennsylvania, the court nevertheless referred to Central Trust Co. v. McGeorge, supra, as applicable on the general question. In Lewis v. Amer. Naval Stores (C. C.) 119 Fed. 391, foreign receivers were recognized as those of the court of original jurisdiction, even as against the jurisdiction of the court of the corporation's domicile. In Farmers' Loan & Trust Co. v. Nor. Pac. R. R. Co. (C. C.) 72 Fed. 26, four justices of the Supreme Court held that the place of original jurisdiction in the Northern Pacific foreclosure suit should be Wisconsin, although the defendant was not organized there, and did not even have any property there, except upon lease.

It is true that the Circuit Court of Appeals for the Fourth Circuit, in Davis v. Hayden, 238 Fed. 734, 151 C. C. A. 584, reversed the appointment of receivers for a solvent individual in a district other than domiciliary. In that case certain creditors had been enjoined from prosecuting actions at law to execution by the order which appointed the receivers, and this they succeeded in vacating, on the ground that the court had no jurisdiction to appoint a receiver at all. However, the debtor was not a corporation, a distinction mentioned in the opinion (238 Fed. 738, 151 C. C. A. 588), and was positively alleged to be solvent. The case is not in point here. The origin and nature of the bill stamps it as in rem. It is to reach the assets of the debtor and apply them to the creditors. As such it goes directly against the assets themselves in substitution for attachment and execution. Just as the power of the court is confined to the assets within is jurisdicion, so it is of no consequence that the domicile of the debtor be elsewhere.

The allegations of the bill as to the financial condition of the corporation are scanty and inartificial. It was, as I have said, proper enough not to allege insolvency, and in its stead the bill alleged that the corporation was largely indebted and could not pay its debts, that its assets could not be quickly converted, that its creditors were threatening to attach, and had begun to do so, and that, though the assets were enough to pay all, if properly conserved, yet, if no receivers were appointed, they would be dissipated, "to the great injury of the creditors and stockholders." The creditors could not be injured, unless in the resulting scramble they would not be paid in full. I could have wished for more explicit allegations than are present, but when the point is only of jurisdiction, and the facts are not disputed, I believe that these will serve, even if they only just serve.

Finally, even if the allegations be insufficient, it does not necessarily follow that these defendants can raise the point. The only valid objection in their mouths is that a payment to the receivers will not be a valid discharge. The corporation has itself consented to the decree, and it is at best a very doubtful question whether the absence of any allegation that the creditors cannot be protected without a receiver would make the bill nonjusticiable. It is to be noted that in Davis v. Hayden, supra, the only case where the point was taken, the objection

was held valid only on motion of other creditors who wished to prosecute their rights.

[3] Assuming, therefore, that the original bill was valid, at least valid enough to give jurisdiction when the facts were not disputed, the next question is whether this is a proper ancillary bill. There is a clear difference between suing receivers and a suit by them to recover assets. Cases like Gableman v. Peoria, D. & E. R. Co., 179 U. S. 335, 21 Sup. Ct. 171, 45 L. Ed. 220, are of the first class, but this is of the second. The very origin of these bills, as I have already said, is to collect the assets of the corporation, and it has always been held to be a part of the ancillary jurisdiction of this court to collect them, regardless of independent jurisdictional facts. White v. Ewing, 159 U. S. 36, 15 Sup. Ct. 1018, 40 L. Ed. 67; Pope v. L., etc., Ry., 173 U. S. 573, 577, 19 Sup. Ct. 500, 43 L. Ed. 814; Glenwood Irrigation Co v. Vallery, 248 Fed. 483, 160 C. C. A. 493 (C. C. A. 8th); Kirkland v. Knox, 230 Fed. 808, 145 C. C. A. 116 (C. C. A. 4th). The absence of proper allegations of citizenship is therefore immaterial.

[4] Was, then, the claim such that the receivers of this court could sue upon it? The claim is upon the contract between the firm and the corporation, or, if that be invalid, upon a quasi contract arising from its past performance. This claim is prima facie barred by the release, and the suit depends primarily on the fraud by which that was procured. But the claim, whether equitable or legal, arises from the contract, and the fraud is alleged only to clear the path for its enforcement. It is argued that the "situs" of the debt is the domicile of the creditor, and that only the Wisconsin receivers might sue. But "situs," so applied, is a fiction which yields as soon as policy requires. Blackstone v. Miller, 186 U. S. 189, 206, 23 Sup. Ct. 277, 47 L. Ed. 439. A debt has no proper situs at all, and the situation at bar is precisely analogous to garnishment.

Here the receivers speak for creditors; they are pursuing their debtor's debtor. It is well settled that in such case the proper place for garnishment is where you can catch the debtor. Pennington v. Fourth Nat'l Bank, 243 U. S. 269, 37 Sup. Ct. 282, 61 L. Ed. 713, L. R. A. 1917F, 1159; Harris v. Balk, 198 U. S. 215, 25 Sup. Ct. 625, 49 L. Ed. 1023, 3 Ann. Cas. 1084. It is true that the right of garnishment is generally exercised only to protect local creditors, but a federal court is not limited by such considerations. It is the especial province of such a court to treat creditors equally, wherever their residence. A creditors' bill, which would lie in a state court to garnish such a claim as this at the suit of a local creditor, will lie in a federal court to reach the same "asset" on behalf of all. Indeed, while the law is not altogether clear, it is probable that New York receivers are the only ones who could sue, since Wisconsin receivers would leave any powers which the court might give them at the state line. I conclude, therefore, that the motions to dismiss the bill for lack of jurisdiction, or because of the plaintiffs' incapacity to sue, should be overruled.

Next comes the defect in substance of the equity of the bill. The argument here is that the agreement constituted a partnership between the corporation and the firm, and that a corporation may not en-

ter into a partnership. Hence the agreement was ultra vires, and under well-settled federal law no action or suit will lie upon it. Ergo, the firm may keep all the profits which it earned, and, so far as I can see, could have kept the coal itself, and left the corporation to pay for it. The argument proceeds from misconception of the doctrine of ultra vires. It is quite true that no obligation results from an ultra vires contract; neither the corporation nor the opposite party is bound, while, as I shall later show, the contract was not in fact invalid, still, since it must be conceded that the question is not wholly free from doubt, it appears to me desirable to discuss this phase of the case on the contrary assumption, and I shall for the moment take it that it was ultra vires.

[5] Even so, the law is settled that neither party to an ultra vires contract may retain what he has received in its execution. Logan, etc., Bank v. Townsend, 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107; Pullman Palace Car Co. v. Central Transp. Co., 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108; Aldrich v. Chemical Nat. Bank, 176 U. S. 618, 20 Sup. Ct. 498, 44 L. Ed. 611; Rankin v. Emigh, 218 U. S. 27, 30 Sup. Ct. 672, 54 L. Ed. 915; Citizens' National Bank v. Appleton, 216 U. S. 196, 30 Sup. Ct. 364, 54 L. Ed. 443. The firm is therefore liable for the coal received, subject to equitable allowance, even if the contract was invalid.

[6] But it is argued that this can be done only after the corporation has disaffirmed the contract. It is true that in Pullman, etc., Co. v. Central, etc., Co., 171 U. S. 151, 18 Sup. Ct. 813, 43 L. Ed. 108, supra, Justice Peckham said that such a suit proceeds "in disaffirmance" of the contract; but this, I submit, does not mean a disaffirmance made in advance of suit, as is required in the case of a contract voidable, and not void. There is by hypothesis no obligation at all, and nothing which a disaffirmance could effect. Being no obligation, it requires no repudiation, for there is nothing to repudiate. It is true that the theory in law of the recovery is changed, but that makes no difference, when precisely the same facts support a recovery in either case. This was expressly so ruled in Appleton v. Citizens' National Bank, 190 N. Y. 417, 83 N. E. 470, 32 L. R. A. (N. S.) 543, and was accepted in the Supreme Court (Id., 216 U. S. 202, 30 Sup. Ct. 365, 54 L. Ed. 443), where Justice Harlan says:

"This action need not be regarded as one on the written contract of guaranty, but as based on an implied contract."

Yet the complaint had been directly upon the guaranty. In the case at bar, as there is no conceivable change in legal position which a disaffirmance could make, the absence of any such cannot invalidate the bill. Whether the cause is of equitable or legal cognizance, I defer for the moment. It is enough, certainly as against motion to dismiss, that as respects the profits received and retained by the firm the bill states a good cause of action or cause of equity.

[7] Next I come to the motions to strike out so much of article ninth as alleges that at the time of the accord the firm promised to account in the future, if necessary. The plaintiffs naturally wished to set up the accord as it was; which apparently included a promise to account

again, if necessary. Perhaps they could have sued on this promise, without more; but I do not see that they were obliged to do so. They seek to reopen the whole account for fraud, and with it the promise to account in the future will fail. If they sued on the promise, the notes would still be outstanding, and they are entitled to their cancellation, which could not be done, unless the promise to account was canceled as well.

A more serious question arises under the second paragraph of the thirteenth article of the bill, which lays a breach of the original contract of April, 1920, by the firm's refusal to accept certain consignments of coal in October, 1920, which they had previously directed the corporation to buy. It is apparent that there can be no recovery upon this if the contract be in fact ultra vires, so that as to this feature of the case the question cannot be avoided, as it was in considering the suit to recover profits. The argument, as I have said, is based upon the presupposition that the contract created a partnership, and that a partnership was ultra vires. We do not know whether the charter of the corporation gave it power to enter into a partnership, but I may assume that it did not. But the contention must rest upon the fact that the agreement contemplated the creation of a partnership, and that as this intention could not be fulfilled the contract was invalid. The defendants certainly cannot stand on any other theory, because, if the parties intended merely to share profits without becoming partners, it cannot be that the law will refuse to enforce it, on the ground that, if they had intended to form a partnership, the corporation had no power to do so. The law does not insist that parties must become partners because they share profits, and as a condition of sharing them; it merely infers that they mean to do so, because they share.

[8] An agreement to share net profits and losses is of course prima facie evidence of an intent to create a partnership, but by the later authorities not conclusively or inevitably. Thus in Fechteler v. Palm Bros. & Co., 133 Fed. 462, 66 C. C. A. 336 (C. C. A. 6th), where only gross profits were to be shared, it was said that the sharing of even net profits was only evidence of partnership. Any definition is hazardous, and it is perhaps unfortunate that the law has not left the intent to become partners to be gathered generally from the evidence in each case. Recent cases where a joint venture accompanied by profit sharing was not held to constitute a partnership are Reid v. Shaffer, 249 Fed. 553, 560, 161 C. C. A. 479 (C. C. A. 6th); Clinchfield Fuel Co. v. Henderson Iron Works Co., 254 Fed. 411, 165 C. C. A. 631 (C. C. A. 5th). In London Assurance Co. v. Drennen, 116 U. S. 461, 472, 6 Sup. Ct. 442, 29 L. Ed. 688, where one Arndt contributed to the funds of the venture and shared in its profits, he was held not by that mere fact to have become a partner, when the parties intended otherwise. In Meehan v. Valentine, 145 U. S. 611, 623, 12 Sup. Ct. 972, 36 L. Ed. 835, Justice Gray stated that, while a joint venture in property, the profits being shared, created a partnership, the evidence was not conclusive; and in Clark v. Sidway, 142 U. S. 682, 12 Sup. Ct. 327, 35 L. Ed. 1157, the same court had held that a single venture in land speculation, where the profits were to be shared, did not have

that result. The well-known exception when an employee is paid in profits is another instance.

It is perhaps true that the agreement at bar would have created a partnership, if made by individuals; yet it is strange that, so far as I have found, no such contract to which a corporation was a party has been held invalid on the ground that a partnership was intended. The question, certainly as between the parties, being entirely one of intent, the proper rule seems to me to be that parties should not be presumed to intend to create a partnership by a joint venture, when one is a corporation. If that intent positively appears, the contract is of course invalid; but why should one assume that the intent includes what the law forbids? A corporation cannot become a partner, and certainly has no such purpose in making a contract like that at bar. Granting that such an intention could be presumed, but for the incapacity of one of the parties, it would be purely gratuitous to impute that purpose, in the face of the incapacity. This conclusion, at least in the case at bar, is reinforced by the fact that this was merely a "tentative agreement," intended to be later taken over by one or more corporations. It was most unlikely that meanwhile the parties could have intended to be partners. I conclude, therefore, that the contract was valid, and that a cause of action arose upon the firm's refusal to accept the coal.

[9] Nor do I think that the addition of this breach made the bill multifarious. There was but a single course of dealing between the parties, both before and after it. True, this was a separate breach, on which separate action could have been brought; but it was none the less an incident in the execution of the whole contract. I can see no reason why it must be singled out for separate litigation, and indeed action on a single breach might have barred any other. If the contract is valid, and an accounting upon it lies in equity, this is but an item in the account, a loss arising from the refusal of one party to perform one of its stipulations in the joint venture. If the contract as a whole was invalid, then, of course, there was no breach.

[10] The jurisdiction of equity over the subject-matter is also disputed. It is clear that, in so far as the bill be limited to an avoidance of the release, there could be no question, before the passage of section 274b of the Judicial Code (Comp. St. § 1251b), that a bill in equity was necessary. Since 1915, when that statute was passed, matter in avoidance may be set up by way of replication, if the cause of action be at law, and perhaps a bill in equity, if it still lies at all, should not draw to itself the disposition of the whole controversy. Indeed, even before that, and while a bill was necessary, it did not do so in all instances, as, for example, in the case of a release for damages resulting from personal injuries.

But it is not necessary in the case at bar to consider any of these questions, for it is enough that this is a complicated joint venture, in which there must be an accounting involving credits and debits on both sides. In the very similar case of Fechteler v. Palm Bros. & Co., supra, the point was raised and decided against the defendants. This case is, moreover, stronger than that, because the accounting is asked of defendants who received coal belonging to both parties, and, having

disposed of it by sales, have fraudulently retained the money. In taking and selling the coal, and so keeping the proceeds, the defendants acted in a fiduciary capacity, and by every rule of equity they became subject to an accounting in a court of equity. Nor would it make a difference if the contract were invalid and the recovery quasi contractual. In that case the coal remained the corporation's till sold, and the defendants became constructive trustees. Indeed, it might even be plausibly argued that the whole profits from the venture should go to the plaintiffs.

In Pullman Car Co. v. Transp. Co., supra, the relief given in quasi contract was upon cross-bill filed to a bill in equity of the Pullman Company, which had had the use of the cars. There had been a demurrer to the cross-bill as improperly filed, the decree overruling which the Supreme Court affirmed. It is true that the court (171 U. S. at page 148, 18 Sup. Ct. 812, 43 L. Ed. 108) did not pass upon the character of the claim as such, and perhaps the cross-bill was germane enough to be proper, though it set up a purely legal demand. Street, Fed. Eq. Prac. §§ 1040, 1041. But certainly the decision does not hold that the claim was legal. Moreover, that was the case of an invalid lease, not, as here, the delivery of property to another to be sold and accounted for. The implied obligation is of the same character as the invalid consensual obligation. If one is the subject of a suit, so must be the other. Hence I conclude that, in either aspect, the claim for an accounting was properly cognizable in equity, regardless of the avoidance of the release for fraud.

[11] There remains only the question of the propriety of joining the Universal Transportation Company and Bullowa. The first is the payee of the notes; the second, their present holder. The bill prays that the notes shall be canceled, and it was certainly proper and probably necessary that the payee should be joined. Bullowa, as holder, was also a proper party. A decree, to be complete, must direct the delivery of the notes for cancellation, and cannot be effective, unless it include the holder.

The motions to dismiss are overruled.