## TRANSCONTINENTAL OIL CO. v. MID-KANSAS OIL & GAS CO.*

Circuit Court of Appeals, Fifth Circuit.
December 4, 1928.

No. 5428.

John J. Hiner, of Fort Worth, Tex., and Nelson Phillips, of Dallas, Tex. (John J. Hiner, of Fort Worth, Tex., Nelson Phillips and J. C. Adams, both of Dallas, Tex., Hiner & Pannill, of Fort Worth, Tex., and Phillips, Townsend & Phillips, of Dallas, Tex., on the brief), for appellant.

R. L. Batts, of Austin, Tex., A. M. Gee, of Tulsa, Okl., Merle N. Poe, of Findlay, Ohio, and W. L. Dean, of Fort Worth, Tex., for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

WALKER, Circuit Judge. By this suit the appellant, Transcontinental Oil Company, asserted the right of dominion over, and to sell or dispose of as it sees fit, the share owned by it of oil produced in operations carried on pursuant to the terms of a written contract, dated November 2, 1923, between appellant and appellee, Mid-Kansas Oil & Gas Company, in which contract appellant was referred to as first party and appellee was referred to as second party. That contract contained recitals as to appellant having options for oil and gas leases covering described lands in Reagan, Pecos, and Crockett counties, Tex.; as to appellant, by the terms of optional contracts held by it, having agreed to drill test wells in consideration of the execution and delivery of leases referred to in such optional contracts; that appellee is willing to drill the test wells provided for in mentioned optional contracts, and to drill another well on described land, "in consideration of the first party assigning to the second party an undivided one-half interest in and

*Rehearing denied January 12, 1929.

to all of the leases and leasehold estates, above described, said assignments to be made under the terms and stipulations hereinafter set forth." The contract provided for appellant obtaining the oil and gas leases above referred to, and assigning to appellant an undivided one-half interest in such leases, for appellee reimbursing appellant the bonus money expended by the latter on leases, the assignments of which are accepted by the appellee and refunding to appellant amounts placed in escrow by appellant to guarantee commencement of specified wells; for appellee drilling to stated depths test wells in described areas at locations selected by appellee; and for appellee's compliance with its obligations as to drilling test wells entitling appellee to the undivided one-half interest in described leases. The contract contained the following:

"All of the expenses of the drilling and casing of said test wells to the depth above mentioned shall be paid by the Second Party, it being understood between the parties hereto that if said test wells, or either of them, produce oil or gas in paying quantities, said well or wells, with the materials therein and derrick, shall become the joint property of the parties hereto without cost to the First Party, but the cost of shooting, tubing, lease tankage, pumping, or other equipment, and the labor necessary to the production of such oil or gas and the operation of any of the leases herein referred to shall be charged to the joint account of the parties hereto. If said test wells, or either of them, be a dry hole, and abandoned, the derrick, casing, and other material furnished by Second Party in drilling said well, or wells, shall remain the property of the Second Party, and future operations on any of the leases shall be charged to the joint account. It being also understood and agreed in this connection that in the event of said test wells, when completed to the depth above mentioned, should not produce oil or gas in paying quantities, and the parties hereto should after consultation decide to drill said wells, or either of them, to a deeper sand, said deeper drilling shall be at the joint account of both parties hereto.

"It is understood by the parties hereto that Second Party shall at all times have the authority to carry on and direct the drilling, development, and operations of any and all of said jointly owned leases and in every reasonable and practicable manner protect the interest and leasehold rights of the parties hereto, such operations, however, to be conducted so far as possible in full harmony.

"It is further agreed that after the delivery of the assignments, hereinabove mentioned, by First Party to Second Party, that Second Party shall pay all rentals to the lessors as provided in said leases and, immediately thereafter, render statement of same to First Party and First Party shall immediately pay to Second Party fifty (50) per cent. of said rentals paid by Second Party, and, in this connection, First Party agrees that in the event it should at any time fail to pay its part of said rentals within thirty (30) days after said statement has been rendered, it will immediately assign its interest in said properties to Second Party on the acreage on which it failed to pay its proportion of said rentals.

"It is further understood that all of the oil and gas produced from said premises shall be run to the credit of Second Party, but that the same shall be owned according to the respective interests of the parties hereto, and that Second Party shall pay to the First Party, after it shall have been fully reimbursed, for bonuses advanced and expenses incurred as hereinabove mentioned, fifty (50) per cent. of the amount received from the sale of oil and gas produced and sold during any month, first deducting fifty (50) per cent. of the actual expenses and development costs during said month, including overhead as hereinafter provided. Second Party shall render statement to First Party covering every thirty-day period showing the amount of oil and gas produced during said month, and shall, on the 15th day of the following month, pay to First Party any amount due, as above provided, for said products produced during the preceding month, but in the event sufficient oil and gas are not produced in any month to the credit of First Party to cover the amount expended by Second Party on account of First Party's interest in said properties, then in that event, Second Party shall render a statement by the 15th day of the following month, showing the amount of money due from First Party to Second Party for said preceding month, the First Party shall pay said amount to Second Party not later than fifteen (15) days after receipt of such statement.

"It is further agreed that the overhead expenses, as hereinbefore mentioned, shall be arrived at and determined on a basis of eight (8) per cent. of the investment and expense in said properties, including material and labor as hereinafter set forth.

"It is further agreed that First Party shall be chargeable with the actual cost of material and expense and labor used in the development and operation of said proper-

ties, prices to be charged shall be the actual cost to Second Party of the said material, expense, and labor; but in no event shall these costs be greater than that which similar expense, labor or material of like quality can be purchased on the open market. It is further understood that the eight (8) per cent. overhead charge hereinbefore provided shall be in lieu of any and all expenses incurred by Second Party, such as general superintendence, purchasing agents, geological and engineering departments, etc., with the understanding that it is not in lieu of extraneous charges, such as taxation, etc.

"It is further understood that First Party shall have the privilege of inspecting the properties herein mentioned and have a representative on the properties if they so desire and shall be informed as to the true and exact condition of said properties and have the right to inspect, at all reasonable times, the books, accounts, vouchers, statements, and pipe line records pertaining to said properties, in possession of Second Party. Second Party shall furnish to First Party production and drilling reports and logs on the properties to be mailed to First Party at least weekly.

"It is further agreed that in the event First Party shall, at any time, desire to sell its interest in said properties and shall have a bona fide offer from any person, persons, or company, willing and able to make such purchase, First Party shall, before making sale of said interest, submit the names of such person, persons, or company, together with such price offered for said interest, to Second Party, and Second Party shall have ten (10) days from the date of submission of such data within which to decide whether it will purchase said interest at the price offered by such other person, persons, or company, and in the event Second Party desires to purchase said interest at the price so offered, it shall have the refusal of doing so.

"It is further agreed by the parties hereto that there is hereby created a lien on the full interest of the First Party in the properties herein mentioned in favor of Second Party for the purpose of securing Second Party in the full payment of any and all expenses, rentals, and advance royalties, when due, expended by Second Party on account of the interest owned and held by First Party in said properties."

Appellant's bill contained allegations to the effect that, while operations in pursuance of said contract were in progress, what is known as the Yates oil field or Yates oil pool in Pecos county, Tex., was discovered, and many wells were and are being drilled in that field by appellee pursuant to said contract, and also by others having holdings in that field, which wells are capable of producing many thousands of barrels of oil daily. Those allegations were admitted. Appellant introduced in evidence division orders and contracts which are hereinafter referred to.

Averments of appellant's bill indicate that, when the contract in question was entered into, oil had not been discovered in the territory in which are located the lands covered by the leases on which appellant had options, and that at that time it was wholly uncertain whether appellee's compliance with the obligations it incurred would result in profit to it, or in the total or partial loss of the part of its outlays and expenses for which it was not entitled to be reimbursed by the appellant. Evidently the venture provided for by the contract was one which might result in serious loss to appellee. The contract states the terms on which appellee consented to make the expenditures for one-half of which appellant agreed to make reimbursement. The appellee alone was at all times to have the authority to carry on and direct the drilling, development, and operation of any and all jointly owned leases. This provision is followed by an explicit one as to the disposition of "all the oil and gas produced from said premises," that provision calling for the running of all oil and gas produced to the credit of appellee, for the appellee, after reimbursing itself for advances and expenses provided for, paying to appellant 50 per cent. of the amount received by appellee from the sale of oil and gas produced and sold. Standing by itself, the provision for appellee having exclusive control of the development and operation of all jointly owned leases well might be regarded as manifesting the intention to vest in appellee the exclusive right to sell all oil produced. As used with reference to oil and gas leases, the word "operation" is ordinarily understood to include the sale by the operator of oil or gas produced. But, when the last mentioned provision is considered in connection with the other specific provision as to the disposition of all of the oil and gas produced, we think the plain language of the contract shows that it was contemplated by the parties that all oil produced was to be disposed of in the way specifically prescribed, with the result that it was not left open to appellant to dispose of its share of the oil in such other way as it might choose. It is not without significance that a provision of the contract enumerates the rights and privileges secured to appellant;

that in that enumeration there is no hint of the existence of a right in the appellant to sell its share of the oil; and that the rights and privileges enumerated are appropriate in the case of the appellee having exclusive control of the disposition of oil produced. It is suggested in argument for appellant that the provision of the contract giving appellee an express lien, unaccompanied by a power to sell, on the full interest of appellant in the properties mentioned to secure all expenditures of appellee in pursuance of the contract, negatives the intention to give appellee the right to sell appellant's share of the oil produced. The provision for a lien covers the contingency of expenses being incurred in operations not resulting in the production of oil or gas. The other provision was with reference to oil or gas after it had been produced. There is no inconsistency between appellee having the lien provided for, and also the right to sell all oil produced, to reimburse itself from the proceeds of the sale for all authorized expenditures, and to withhold from appellant all of the proceeds of the sale until the net share thereof to which appellee is entitled becomes payable.

■ It is suggested that certain transactions of the parties, while performance under the contract was in progress—their joining in division orders with reference to oil produced, and two sales by appellant to appellee of stated quantities of oil to which appellant was or would be entitled—indicated that the parties treated the contract as not conferring on appellee the exclusive right to sell the share of the oil owned by appellant. Assuming, but not conceding, that there is such indefiniteness or ambiguity in the terms of the provisions in question as to warrant a court in looking to the actions of the parties under the contract in determining its meaning, we are of opinion that the transactions referred to do not indicate that the parties treated the provisions in question as having the meaning now contended for by appellant. Under each of the division orders joined in by appellant, all the oil to which the parties were entitled was to be run to the credit of appellee, and appellee alone was to receive payment for that oil. The joining by all parties owning interests in such oil in such division orders well may be considered a precaution against the recipient of the oil raising objections to paying the whole of the price of it to one known not to be the owner of all of it. It is not to be supposed that the buyer of oil owned by several would look to a contract between the owners to determine to whom the price of it is payable when it is practicable

for the owners to give to the buyer direction as to the payment of the price. The two sales referred to were not in accordance with the provisions of the contract. Under the terms of each of the sales, appellant was to be paid the whole or part of the price before the oil which was sold was produced. Under the contract appellant was not entitled to be paid for its share of oil until after the oil had been produced and sold. In making those two sales, the parties did what obviously was not called for by the contract sued on. Those sales, being results of new and different contracts, did not evidence a construction by the parties of the provisions in question.

■ It was suggested that, if under the provisions in question appellee had the power to sell appellant's share of the oil produced, that power is revocable because it is one not coupled with an interest. We think the fact that under the contract appellee had the right to charge against appellant's share of oil produced, which was subject to the lien given, or the proceeds of the sale of it, the amount of expenditures for which appellee was entitled to reimbursement, was enough to make the power one coupled with an interest. Wilson v. Snow, 228 U. S. 217, 33 S. Ct. 487, 57 L. Ed. 807; 21 R. C. L. 775.

■ Another suggestion is that, if the contract has the meaning contended for by appellee, it had the effect of creating a mining partnership between the two corporations, the charter of neither of which authorized it to enter into a partnership, with the result that the contract was illegal and void, and its executory provisions are unenforceable. The terms of the contract negative the existence of an intention to create a partnership relation between the parties. The relation created lacked ordinary incidents of a partnership. The contract did not authorize either party to create liabilities to third parties binding on the other. The creation of such liabilities was not a necessary result of performance under the contract, and it was not alleged or proved that operations under the contract have resulted, or are likely to result, in the creation by one of the parties of liabilities to third parties which are enforceable against the other party to the contract. The operations provided for were to be conducted by appellee alone at its own expense, and appellee's compliance with its obligations had the effect of conferring on it the right to the stipulated overhead and to reimbursement for one-half of the amount of expenses incurred. Two joint owners in equal shares of oil and gas leases may, without forming a partnership, contract for the exclusive opera-

tion of the leases by one of them, and for the operator, in the event of the production of oil (which was owned by the parties before operations under the contract were begun), paying to the other joint owner one-half of the proceeds of the sale of that oil, less the expense of finding it, bringing it to the surface, and disposing of it. We do not think that, as between the parties and contrary to their intention, the contract had the effect of creating a partnership. Luhrig Collieries Co. v. Interstate Coal & Dock Co. (D. C.) 281 F. 265; Stark v. J. M. Guffey Petroleum Co. (Tex. Civ. App.) 80 S. W. 1080; Clinchfield Fuel Co. v. Henderson Iron Works (C. C. A.) 254 F. 411.

We conclude that the appellant did not have the right asserted by the suit, and that the decree dismissing its bill was not erroneous. That decree is affirmed.