**EASTEP et al. v. TRAVELERS INS. CO.**

No. 15198.

Court of Civil Appeals of Texas.
Fort Worth.

Dec. 22, 1950.

Rehearing Denied Jan. 19, 1951.

Christopher & Bailey, of Fort Worth, for appellants.

Cantey, Hanger, Johnson, Scarborough & Gooch, Charles L. Stephens and Emory Cantey, all of Fort Worth, for appellee.

HALL, Justice.

There was one special issue submitted to the jury in this workmen's compensation case, to-wit:

"Do you find from a preponderance of the evidence that, on July 14, 1949, the Freedman Iron & Supply Company and the W. Silver Company were not engaged in a 'joint venture' in salvage operations at the Sinclair Refinery, under an agreement between them?", to which the jury answered: "They were not engaged in a joint venture."

The trial court rendered judgment non obstante veredicto for the insurance carrier, appellee herein.

Appellants' three points consist of an over-all complaint to the effect that said trial court erred in not rendering judgment for them based upon said jury finding.

We will review the testimony in its most favorable light to appellants. We will also consider same as true while determining its sufficiency.

The late Earnest Eastep met his untimely death on July 14, 1949, while doing his third day's work for Friedman Iron and Supply Company of Fort Worth; he left as survivors appellants herein, his wife and three minor children.

Appellee contends there was insufficient evidence in the record to support said jury

finding in that said testimony disclosed that its policy of workmen's compensation was issued to one legal entity when the claimant was injured while in the employ of another and different legal entity. It undertook to prove that the deceased was killed while working for a partnership composed of Friedman Iron and Supply Company, with a branch office in Fort Worth, Tarrant County, Texas, where the accident occurred, and W. Silver Company, of El Paso, Texas, which was also engaged in the handling of scrap metal.

Undisputed facts show that the Friedman Iron and Supply Company and W. Silver Company purchased from a Sinclair refinery in Fort Worth, Tarrant County, salvage metal at a cost in excess of $20,000. This scrap metal was to be divided between the companies equally. It is as to the way and manner this division was made which these parties differ; appellee claiming that their actions created a partnership or joint venture, and appellant contending, and the jury found, they did not. The deceased was killed while operating equipment on the premises where said salvage metal was located.

Some of the facts proven, supporting the jury's answer to the above special issue, are from the following statement of W. Silver, introduced by appellee:

"* * * The amount of money required was a little more than I wanted to gamble, considering the market at the time, so I called Mr. Freidman of Freidman Iron and Supply Company, of Shreveport, Louisiana, to see if he wanted to participate in the salvage of this material. Mr. Freidman agreed to come into the deal, and he closed the deal with Griggs. My agreement with Freidman Iron and Supply Company was verbal, but it was understood that W. Silver Company and Freidman Iron and Supply Company would put up like amount of money, and each of us would take our proportionate part of the salvage metal from the refinery to where ever we desired; that the Freidman Iron and Supply Company could take their portion of material to whatever place they wanted to store it, and W. Silver Company could take their portion of the material to whatever location they desired. I sent a truck to Fort Worth so my material could be removed to Freidman Iron and Supply Company's yard where I would later send one of my truck and trailers to pick it up. Freidman at first had permission to hire men to work on my truck and to supervise them, because I did not send anyone to Fort Worth to represent me or to work for me. Sometime in May, 1949, Freidman Iron and Supply Company sent us a bill for labor for my truck, and we sent them a check payable to them. They wrote us about this check, and wanted to know if we wanted them to carry the men on their payroll, or if we wanted to carry the men on our payroll for this particular truck, and we told them to cash the check and we would carry the labor on our payroll; however, sometime after May '49, and I believe it was in June, 1949, I was in Fort Worth and Freidman Iron and Supply Company said they would carry all of the labor on their payroll to keep from getting mixed up. I do not think anything was said about insurance on these men, but I assumed that Freidman Iron and Supply Company would carry the insurance on these men. Freidman Iron and Supply Company made arrangements for a crane truck, and so far as I know, made arrangements for this truck to use in their part of the business. * * *

"Freidman Iron and Supply Company had full control of the labor so far as I was concerned, in that they paid the labor and hired and fired them, and otherwise generally supervised their work. There was no agreement between W. Silver Company and Freidman Iron and Supply Company whereby we would split the proceeds or split the losses. Each of us had so much money to purchase materials for our own companies, and each of our companies speculated on whether or not we could individually sell this material at a profit. If I had a better market for the material in El Paso and made more money off of my part then Freidman Iron and Supply Company could make on their market in Fort Worth, that was to the benefit of W. Silver Company. In other words, if I made a profit on our materials purchased by W. Silver

Company, and Freidman Iron and Supply Company lost money on their portion of the same materials, W. Silver would not reimburse Freidman Iron and Supply Company for any part of their loss, because each concern was operating strictly on their own, so far as profit and loss was concerned.

"At no time did I ever instruct Freidman Iron and Supply Company as to what type of employees to hire for work at the refinery, or have anything to do with the number of hours the employees worked, the amount of pay they earned, or the type of equipment they used. This was entirely up to Freidman Iron and Supply Company.

\*　　\*　　\*　　\*　　\*

"Q. Did you have any understanding or agreement with Friedman Iron and Supply Company with respect to the profit and loss on the whole project? A. Each party was responsible for his own loss and profit."

Harold Friedman, a junior partner of Friedman Iron and Supply Co., testified substantially as follows:

That he was designated as bookkeeper for the Company; that he employed the deceased to work for Friedman Iron and Supply Company; that his Company paid social security for the deceased; that deceased Eastep worked the first day on their yard and the next two days, up until his death, he worked at the refinery removing this waste metal; that such operation was in the exclusive control of Friedman Iron and Supply Company; that said Company paid deceased's estate for the three days' labor; that said Company also paid compensation insurance on said deceased; that W. Silver Company had nothing to do with the employment for the job; that no employee or representative of the W. Silver Company ever appeared at the refinery and directed any work there; that said W. Silver Company did not pay the premiums due on said compensation insurance.

■ We believe the above testimony is sufficient to raise a fact issue for the jury to decide as to whether the parties were or were not running a joint venture or partnership while purchasing and removing

the waste iron from said Sinclair refinery property.

The trial court erred in rendering judgment non obstante veredicto for appellee.

■ While there are many definitions of partnership and joint adventure, we like the one quoted in 68 C.J.S., Partnership, § 1, p. 398, by Chancellor Kent, as follows: "A contract of two or more competent persons, to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss, in certain proportions." We find the above definition covers all the essential elements of a partnership. For other definitions, see 32 Tex.Jur., p. 215, sec. 2. As to joint adventurers, see 25 Tex.Jur., p. 159.

■ Appellee admits in its brief that the two companies which it claims were conducting a joint venture and/or a limited partnership did not agree to share the profits. We find under the testimony that since they were only to divide the property which they bought fifty-fifty, that such fact merely places the parties as co-owners of the scrap iron. The mere fact that one party agreed to furnish all the labor in removing the scrap metal and charging the other party his fifty per cent of the cost does not under the law constitute a partnership. As to other definitions of joint venture and partnerships, we cite appellants' authorities: Henning v. Cox, 5 Cir., 148 F.2d 586; Holcombe v. Lorino, 124 Tex. 446, 79 S.W.2d 307; Donald v. Phillips, Tex.Com.App., 13 S.W.2d 74; Luling Oil & Gas Co. v. Humble Oil & Refining Co., 144 Tex. 475, 191 S.W.2d 716; Transcontinental Oil Co. v. Mid-Kansas Oil & Gas Co., Circuit Court of Appeals, 5 Cir., 29 F.2d 323. There is similarity in the facts set out in these cases and those before us.

Appellee relies principally upon the case of New Amsterdam Cas. Co. v. Harrington, Tex.Com.App., 290 S.W. 726, to support its contention that these two companies were operating a joint enterprise and/or limited partnership. We find distinction in that case and the one at bar as thus: The employee Harrington alleged

that one Dr. L. F. Gragg was his employer and subscriber under the policy issued by the insurer, while the evidence showed that a co-partnership composed of Gragg and others was the employer and that Harrison was engaged by Gragg to work for the co-partnership; while in the instant case the testimony shows that the deceased was hired to work for the Friedman Iron and Supply Company by the Friedman Iron and Supply Company and was working for them and no one else at the time of his death.

The only cross-assignment of error presented by appellee, Rule 324, Texas Rules of Civil Procedure, charges that the evidence is insufficient to support the verdict. This cross-assignment is overruled for reasons above indicated. It would be proper for this Court to render a judgment for appellant, on the jury's finding, LeMaster v. Fort Worth Transit Co., 138 Tex. 512, 160 S.W.2d 224, except the record contains no finding of the trial court respecting an award of a fee to appellants' attorney. It is therefore our order that judgment of the trial court be reversed, and said cause remanded to it, with instructions to render judgment forthwith for appellants on the jury's finding and to fix amount of attorney's fee to be awarded appellants' attorney.

Reversed and remanded with instructions.